Catherine **SCOTT** et al., Plaintiff,

v.

**WINSTON–SALEM/FORSYTH COUNTY BOARD OF EDUCATION, a public body corporate, Board of County Commissioners of Forsyth County, a public body corporate, North Carolina State Board of Education, a public body corporate, and Dr. A. Craig Phillips, North Carolina State Superintendent of Public Instruction, Defendants.**

No. C–174–WS–68.

United States District Court,
M. D. North Carolina,
Winston-Salem Division.

June 25, 1970.

---

8. See also: Armendariz v. Hershey, *supra* note 7; United States v. Rundle, 413 F.2d 329 (8th Cir. 1969).

9. See footnote 3, *supra*.

Adam Stein, and Julius LeVonne Chambers, Charlotte, N. C., for plaintiffs.

William F. Womble, and John L. W. Garrou, Winston-Salem, N. C., for defendant Winston-Salem Forsyth County Bd. of Ed.

Roddey M. Ligon, Jr., and P. Eugene Price, Jr., Winston-Salem, N. C., for defendant Bd. of County Commissioners of Forsyth County.

Ralph Moody, Andrew A. Vanore, Jr., and Burley B. Mitchell, Jr., Raleigh, N. C., for defendants North Carolina State Bd. of Ed. and Dr. A. Craig Phillips.

## MEMORANDUM AND ORDER

GORDON, District Judge.

The plaintiffs in the complaint filed in the cause allege that the public schools in the Winston-Salem/Forsyth County Administrative Unit are operated on a racially discriminatory basis in that, among others, attendance zones are gerrymandered to promote discrimination, teachers are assigned to schools where the majority of the students are of the teachers' race, school bus routes are established to perpetuate segregation, school lunch programs are operated on a discriminatory basis both as to quantity and quality, discriminatory practices are engaged in through the hiring of teachers, special schools are established to favor whites, vocational schools are established to favor whites, curricula of the Negro schools are inferior to white, and parking facilities at Negro schools are inferior to white. Succinctly, it might be said that it is contended that in all respects a dual system is being operated. Generally, the prayer of the complaint requests the complete desegregation of the schools and for preliminary and permanent relief.

The action was instituted on October 2, 1968. Following the filing of the complaint, on November 19, 1968, plaintiffs moved to amend the complaint. This motion was allowed. Again on January 13, 1969, the plaintiffs moved to amend the complaint. This motion was denied. Discovery by the parties ensued promptly and several motions, including motions for summary judgment by the defendants other than the Winston-Salem/Forsyth County Board of Education, and objections were filed.

On December 17, 1969, the plaintiffs filed a motion for preliminary injunction. Prior to the filing of the motion, no request, other than the usual request contained in complaints filed in this type action, was made to the Court to hear the matter regarding the issuance of a preliminary injunction. Faced with a heavy schedule of cases already set for trial, but nevertheless feeling that the hearing of the motion should be given some priority, Court schedules were rearranged and the hearing on the motion began January 9, 1970. At the conclusion of the day on January 9, 1970, the hearing was recessed to begin again January 21, 1970. The hearing was concluded on January 27, 1970. On February 17, 1970, the plaintiff's motion for preliminary injunction was denied by an order of the Court containing findings of fact and conclusions of law. Since all

the evidence presented at the hearing on the matter of the preliminary injunction is germane to the resolution of issues now before the Court, those findings of fact contained therein will be repeated and expounded upon in this memorandum opinion.

The Court and counsel realizing the urgency for consideration of the issues raised, expedited the hearing of the matter on the merits with full cooperation of counsel representing all parties by dovetailing hearing days on rather short notice into already established court calendars. The hearing on the merits was concluded on April 30, 1970, at which time briefing schedules were established. The record of the hearings is voluminous, consisting of 1,334 pages of transcript and 128 exhibits. The hearings on the preliminary injunction motion and merits lasted nine days.

The Court having considered the evidence presented, briefs and arguments of counsel, makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### 1. The Consolidated System

Prior to 1963 there were two school systems in Forsyth County. The Winston-Salem School Administrative Unit had jurisdiction over all schools within the corporate limits of the City of Winston-Salem. The Forsyth County School Administrative Unit had jurisdiction over all schools in Forsyth County outside the corporate limits of the City of Winston-Salem. Pursuant to a special act of the General Assembly (Chapter 112, 1961 Session Laws) and by vote of the people of Forsyth County, the two systems were consolidated as of July 1, 1963.

### 2. Geographical and Statistical Data

The Winston-Salem/Forsyth County Board of Education has jurisdiction over and is responsible for the operation of all public schools in Forsyth County, North Carolina. Forsyth County is roughly rectangular in shape, its longest East-West dimension being about 26 miles and its longest North-South dimension being about 20 miles. It comprises 424 square miles. The estimated current population of the County is 235,000, of whom approximately 22.5% are non-white. Winston-Salem, the principal city in Forsyth County, comprises 57.5 square miles; it is located in the south-central part of the County and has an estimated current population of about 152,000. Other communities in Forsyth County include: Kernersville, an incorporated town, population about 4,200, located about ten miles east of Winston-Salem; Walkertown, unincorporated, population about 1,240, located northeast of Winston-Salem; Rural Hall, unincorporated, population about 1,500, located about 10 miles north of Winston-Salem; Lewisville, unincorporated, located northwest of Winston-Salem; and Clemmons, unincorporated, population in excess of 2,000, located about 10 miles west of Winston-Salem. Most of the black population of the County resides in the northern, eastern, and to some extent, southern portions of the City of Winston-Salem. Less than 10% of the County's population, outside the City of Winston-Salem, is black.

There are 67 schools in the Winston-Salem/Forsyth County System. Of these, 42 are elementary schools, 15 are junior high schools and 10 are senior high schools. Two of the elementary schools, the Children's Center and The Children's Home, are privately owned and operated. The Winston-Salem/Forsyth County School System provides faculty for these two schools. As of December 19, 1969, there were 50,455 students and 2,099 full-time members of the teaching staff in the Winston-Salem/Forsyth County School System. Of these students, 36,521 (72.5%) were white, 13,879 (27.5%) were Negro, 35 were Indian, 13 were Oriental and 7 were Spanish. Of the faculty 1,535 were white, 561 were Negro, 1 Oriental and 2 Spanish.

The following is a chart showing the name and racial make-up of the schools in this System as of December 19, 1969:

TABLE I

Elementary Schools

| Name of School | Students | | | Percentage of |
| | Negro | White | Total | Negro Students |
|---|---|---|---|---|
| Ardmore | 7 | 588 | 595 | 1.18% |
| Bolton | 1 | 520 | 521 | .19% |
| Brown | 663 | 0 | 663 | 100% |
| Brunson | 135 | 544 | 679 | 24.82% |
| Carver Crest | 477 | 0 | 477 | 100% |
| Carver | 706 | 3 | 709 | 99.58% |
| Children's Center | 4 | 46 | 50 | 8% |
| Children's Home | 0 | 180 | 180 | 0% |
| Clemmons | 14 | 973 | 987 | 1.42% |
| Diggs | 609 | 0 | 609 | 100% |
| Easton | 146 | 191 | 337 | 43.32% |
| Fairview | 693 | 0 | 693 | 100% |
| Forest Park | 20 | 647 | 667 | 3% |
| Fourteenth Street | 583 | 0 | 583 | 100% |
| Griffith | 0 | 1020 | 1020 | 0% |
| Ibraham | 0 | 361 | 361 | 0% |
| Kernersville | 36 | 1116 | 1152 | 3.13% |
| Kimberley Park | 778 | 0 | 778 | 100% |
| Konnoak | 1 | 550 | 551 | .18% |
| Latham | 7 | 419 | 426 | 1.64% |
| Lewisville | 29 | 602 | 631 | 4.6% |
| Lowrance | 726 | 12 | 738 | 98.24% |
| Mebane | 504 | 0 | 504 | 100% |
| Mineral Springs | 48 | 833 | 881 | 5.45% |
| Moore | 0 | 439 | 439 | 0% |

[A2704]

## TABLE I (CONT.)
### Elementary Schools

| Name of School | Students Negro | White | Total | Percentage of Negro Students |
|---|---|---|---|---|
| North Elementary | 689 | 0 | 689 | 100% |
| Oak Summit | 30 | 657 | 687 | 4.37% |
| Old Richmond | 41 | 309 | 350 | 11.71% |
| Old Town | 99 | 1189 | 1288 | 7.61% |
| Petree | 49 | 281 | 330 | 14.85% |
| Rural Hall | 50 | 871 | 921 | 5.43% |
| Sedge Garden | 7 | 939 | 946 | .74% |
| Sherwood Forest | 1 | 822 | 823 | .12% |
| Skyland | 483 | 0 | 483 | 100% |
| South Fork | 2 | 691 | 693 | .29% |
| South Park | 4 | 536 | 540 | .74% |
| Speas | 2 | 997 | 999 | .20% |
| Union Cross | 3 | 659 | 662 | .45% |
| Vienna | 12 | 423 | 435 | 2.76% |
| Walkertown | 91 | 917 | 1008 | 9.03% |
| Waughtown | 0 | 360 | 360 | 0% |
| Whitaker | 7 | 608 | 615 | 1.14% |

* * * * * *

### Junior High Schools

| | | | | |
|---|---|---|---|---|
| Anderson | 517 | 0 | 517 | 100% |
| Carver | 240 | 0 | 240 | 100% |
| Dalton | 0 | 831 | 831 | 0% |
| Glenn | 2 | 771 | 773 | .26% |
| Griffith | 0 | 525 | 525 | 0% |
| Hanes | 500 | 13 | 513 | 97.47% |

[A2705]

TABLE I (CONT.)
### Junior High Schools

| Name of School | Students Negro | White | Total | Percentage of Negro Students |
|---|---|---|---|---|
| Hill | 41 | 530 | 571 | 7.18% |
| Jefferson | 1 | 815 | 816 | .12% |
| Kennedy | 1042 | 1 | 1043 | 99.90% |
| Kernersville | 24 | 500 | 524 | 4.56% |
| Mineral Springs | 28 | 890 | 918 | 3.05% |
| Northwest | 107 | 960 | 1067 | 10.03% |
| Paisley | 552 | 0 | 552 | 100% |
| Philo | 19 | 638 | 657 | 2.89% |
| Southwest | 19 | 1248 | 1267 | 1.50% |
| Walkertown | 45 | 622 | 667 | 6.75% |
| Wiley | 183 | 626 | 809 | 22.62% |

* * * * * *

### Senior High Schools

| Name of School | Negro | White | Total | Percentage of Negro Students |
|---|---|---|---|---|
| Anderson | 402 | 0 | 402 | 100% |
| Atkins | 1135 | 0 | 1135 | 100% |
| Carver | 240 | 0 | 240 | 100% |
| East | 65 | 1474 | 1539 | 4.22% |
| Mt. Tabor | 1 | 1219 | 1220 | .08% |
| North | 305 | 1461 | 1766 | 17.27% |
| Parkland | 61 | 1461 | 1522 | 4.01% |
| Reynolds | 255 | 1458 | 1713 | 14.89% |
| West | 23 | 1056 | 1079 | 2.13% |
| Continuing Education | 53 | 9 | 62 | 85.48% |
| Central Rehabilitation Center | 186 | 166 | 352 | 52.84% |

[A2706]

During the 1969–1970 school year, of the 67 schools in the system, there are 9 all-black elementary schools, 1 all-black junior high school and 3 all-black senior high schools. There are 5 all-white elementary schools, 2 all-white junior high schools and no all-white senior high schools. In the 49 schools in which there is some degree of racial mix, it runs the gamut from schools with 1 white and the rest black to schools with only 1 black and the rest white. The 49 schools also include those (Skyland, North Elementary, Hanes Junior High and Lowrance) which were formerly all-white and which are now black or predominantly black because of the change in the residential patterns of the neighborhood served by the school.

### 3. *History of Pupil Assignments by the Local Board*

Winston-Salem, Charlotte and Greensboro were the first communities in North Carolina to admit a Negro child to a formerly all-white school. This was done in 1957. In that year one child transferred to Reynolds High School. During the years that followed, the number of Negro pupils attending formerly all-white schools as a result of the approval of requests for such transfer were as follows:

| | |
|---|---|
| 1958 | 4 |
| 1959 | 8 |
| 1960 | 10 |
| 1961 | 18 |
| 1962 | 44 |

Beginning in 1963 the idea prevailed that desegregated school systems should no longer keep official records of a pupil's race. As a result the number of pupils by race is not available for 1963 and 1964. Since 1965 HEW has required such information, and the information has been obtained from the principal of each school in order to comply with their requirement; the HEW reports, which are the only racial records available since 1965, show that the number of black students attending predominantly white schools in years subsequent to 1964 were:

| | |
|---|---|
| 1965 | 509 |
| 1966 | 1246 |
| 1967 | 1486 |
| 1968 | 2155 |
| 1969 | 2016 |

Blacks also attend schools which are predominantly black, but not all black. For example, in the current school year (1969–70), there are 3,160 blacks attending such schools, in which the total number of white students is 193.

As can be seen, the number of children attending desegregated schools has steadily increased through the years. After the passage of the Civil Rights Act of 1964, the school system consistently adhered to guidelines set up by the Department of Health, Education and Welfare. HEW representatives visited the school system and approved the system's desegregation plans and attendance area maps on each occasion until litigation ensued when, by reason of the school system's involvement in litigation, the submission of plans was not required.

The integration achieved during the years 1965–1969 resulted primarily from three things:

A. Elimination of the only remaining overlapping attendance zone and of the only remaining overlapping bus route. (Carver School had been built to accommodate all Negro children (grades 1 through 12) in Forsyth County who resided outside Winston-Salem. Prior to 1965 those who desired to do so were permitted to continue at Carver with school bus transportation being provided for them. By 1965 Carver School was given specific, non-overlapping attendance zone lines and school bus transportation from outside the Carver zone was discontinued.)

B. Establishment of a geographic attendance zone plan, with free choice of transfer. Under this plan, which was approved by HEW, each child was assigned to the school in the zone in which he lived. This would normally be the school nearest where he lived. Then every child was given the privilege of transferring to any other school in the system, so long as there was room to accommodate him. No transportation was afforded. The capacity of each school was predetermined. Under the regulations, if there were more applicants than could be accommodated, priority was given on the basis of the proximity of the child's residence to the school. And any child who could not be accommodated at the school of his first choice, could go to some other school, of his own choosing, where there was room available. Plaintiffs do not contend that any child has been denied the privilege of transferring to a school of his choice; in fact certain of the plaintiffs have done so.

C. Closing of Paisley High in 1968 and redrawing attendance boundary lines so as to assign its pupils to North Forsyth and Reynolds (predominantly white) and to Atkins High (black) with the beginning of the 1968–69 school year.

Furthermore, in March, 1968, the voters of the Winston-Salem/Forsyth County Administrative Unit voted 24.8 million dollars in bonds for school construction and equipment. Initial projects proposed for the use of this money would have resulted in approximately 1,475 Negro students being reassigned to predominantly white schools. Pending litigation against the School Board caused a loss of marketability of these bonds, and consequently, these plans have had to be delayed. An offer by the School Board to the plaintiffs to spend the proceeds only after Court approval was rejected.

### 4. *The Predominantly Black Schools*

#### TABLE II

| Name of School | Date of Initial Construction[1] | Percentage of Negroes In Attendance Zone[2] |
| --- | --- | --- |
| Brown | 1914 | 90–100% |
| Carver Crest | 1950 | 90–100% (encompasses part of a census tract which is 20–29.99% black) |
| Diggs | 1953 | 80–89.99% |
| Fairview[3] | 1962 | 90–100% |

---

[1] These are the dates when the first construction was begun on the particular site. In most cases additional construction has taken place since the date which has been noted. For example, Kimberly Park was destroyed by fire and was completely rebuilt on the same site in 1966.

[2] This data was obtained by the use of Plaintiff's Exhibits No. 29 and 42.

[3] Prior to 1960, this school had an all-white student body.

[A3012]

## TABLE II (CONT.)

| Name of School | Date of Initial Construction | Percentage of Negroes In Attendance Zone |
|---|---|---|
| 14th Street | 1922 | 90-100% |
| Kimberly Park | 1925 | 90-100% |
| Lowrance[4] | 1955 | 90-100% (encompasses part of a census tract which is 0-9.99% black) |
| Mebane | 1928 | 80-89.99% |
| North[5] | 1923 | 90-100% (contains part of a census tract which is 80-89.99% black) |
| Skyland[6] | 1923 | 90-100% (contains part of a census tract which is 30-39.99% black) |
| Carver | 1950 | 90-100% (contains part of a census tract which is 10-19.99% black) |
| Anderson | 1958 | 80-89.99% |
| Hanes[7] | 1930 | 90-100% |
| Kennedy | 1963 | 90-100% |
| Paisley | 1957 | 90-100% (contains part of a census tract which is 20-29.99% black) |
| Atkins | 1930 | 90-100% |

---

[4] Approximately four years ago, this neighborhood and school were predominately white. There was a rapid transition to black for two years, but this has since slowed down.

[5] This school was predominately white until 1964.

[6] This school was predominately white until the 1940's.

[7] Until 1965 this was a predominately white junior high school. Then, over a period of about three years, it shifted to predominately black.

[A3013]

The geographic attendance zone for Diggs Elementary School (609 black and 0 white) is bordered on the west by the attendance zone for Latham Elementary School (7 black and 419 white); on the south by a section of the South Park Elementary zone (4 black and 536 white); and on the east by a small section of the Forest Park Elementary zone (20 black and 647 white). These lines as they are drawn are not arbitrary. The boundary line dividing Diggs and Latham is Main Street (Highway 52), a divided four lane thoroughfare which is heavily traveled and constitutes a hazardous area, particularly during the morning rush hours. The southern and eastern boundaries of Diggs, separating it from South Park and Forest Park, run through an industrial area which is approximately three blocks wide. Generally, Diggs serves a housing project which is located close to the school. This is a thickly populated, small zone and access from without the zone would be difficult without the construction of structures to overcome the obstructions.

Both Carver Crest (477 black and 0 white) and Kimberly Park (778 black and 0 white) are bordered to the west by the Brunson zone (135 black and 544 white). The western boundary of Carver Crest runs along the property of the Methodist Children's Home; this property is mostly undeveloped and has no roads passing through it. The western boundary of Kimberly Park runs along the northern sector of the Brunson district. This particular area within the Brunson district supplies Brunson with a very small part of its pupil population. It contains a golf course and a business district, as well as a sparsely inhabited residential area in which there are few children. Also contained in this northern sector is the acreage of the Children's Home.

Mebane Elementary (504 black and 0 white) is bordered on the east and part of the south by Forest Park (20 black and 647 white). The southern portion is marked by a railway. The eastern border has been established along Stadium Drive (Highway 311 and 109) which is a major access route into the city. This is a four lane, undivided thoroughfare.

Forest Park also borders the southern portion of the Skyland Elementary district (483 black and 0 white). This boundary is drawn along the Southern Railway lines and on both sides of the railroad there is light to medium industry. Skyland is bordered on the east by the Petree Elementary district (49 black and 281 white). This line follows roughly the old city limits (Skyland was a part of the city system and Petree was a part of the county system until consolidation in 1963). The area through which the line runs is not well developed. The Petree district has been redrawn under the School Board's plan which will be dealt with later in this opinion. Skyland, as has been noted previously, was at one time an all-white school.

Lowrance Elementary (726 black and 12 white) is bordered on the north by the Mineral Springs (48 black and 833 white), Oak Summit (30 black and 657 white), and Ibraham (0 black and 361 white) districts. As was noted previously, the Lowrance district has changed generally from white to black in the last four years. The district lines have not been changed in that time. Since these two districts are modified by the School Board's proposed Pupil Assignment Plan for 1970–71, this general area will be dealt with under the Court's discussion of that plan.

The same will be done with the Carver district, which has been extensively revamped under the Board's plan for 1970–1971.

The Brown Elementary zone (663 black and 0 white) borders on the southwest portion with that of Brunson Elementary (135 black and 544 white). This line is drawn through the heart of the Winston-Salem business district and there are few, if any, students living in this area.

North Elementary (689 black and 0 white) is surrounded on all sides by the zones of predominantly or all-black schools, with the exception of a small part of the southwest border which is contiguous with the Brunson zone. The neighborhoods are black on both sides of this line.

Fairview Elementary (693 black and 0 white) and Fourteenth Street Elementary (583 black and 0 white) are totally surrounded by other predominantly black or all-black schools.

Anderson Junior-Senior High (943 black and 0 white—approximately 400 senior high students) has previously encompassed and been fed by the Mebane Elementary and Diggs Elementary zones. Under the Board's proposed pupil assignment plan for 1970–1971, the senior high school would be discontinued and the structure would be used for a junior high school only. The junior high school zone would be left intact and the projected enrollment figures are 541 black and 0 white.

Paisley Junior High School (552 black and 0 white) is presently being fed by the Kimberly Park and Carver Crest schools. It borders the Wiley Junior High zone (183 black and 666 white) which includes Brunson Elementary. For a description of the boundary lines see the discussion under the elementary schools.

Hanes Junior High School (500 black and 13 white) is being fed by Lowrance and North elementary schools. Until around 1964 or 1965, this was a predominately white school. The shift to predominately black was a gradual one over a three year period.

Kennedy Junior High School (1042 black and 1 white) is fed by Brown, Fairview, Fourteenth Street, and Skyland elementary schools. Kennedy is located close to Brown Elementary and is completely surrounded by all black neighborhoods.

The Carver Junior High zone has been extensively modified under the Board's proposed plan for 1970–1971 and will be discussed at a later point in the opinion.

There were during the 1969–1970 school year three predominately black senior high schools. Two of these, Carver and Anderson, also contained junior high school plants within the same building. Under the Board's proposed plan for 1970–1971, the senior high school operations in both these schools would be discontinued, thus leaving only one all-black senior high school in the system. That would be Atkins (1135 black and 0 white) which is being fed totally by Kennedy Junior High. Atkins, as Kennedy, is located in a heavily populated, all-black section of the city.

All sixteen of these predominately or all-black schools in operation during the 1969–1970 school year were compacted in an area 3½ miles at its widest point and 5 miles at its longest point. This area encompasses densely populated, black neighborhoods.

### 5. *The Predominately White Schools*

The vast majority of the remaining city schools, located in the west and southern portions of Winston-Salem are predominately white. The attendance zone located in the northwestern central part of the city encompassed by Brunson Elementary, Wiley Junior High and Reynolds Senior High is an exception. In Brunson, partly due to geographical zoning, but in large part due to the exercise of freedom of transfer, the black percentage of the student body is 24.82%. Wiley Junior High School has 22.62% black student body; and Reynolds High School has 14.89% black student body. Another exception is Easton Elementary which is located in the southern part of the city. It has a percentage of 43.32% black contained in its student body. This is due to a predominately black community which lives nearby the school site. Petree Elementary, which is adjacent to Skyland in the eastern part of the city, has 14.85% of its student body black. In the northwestern portion of the county, serving an area which is rural and agriculturally

based, Old Richmond Elementary has 11.71% blacks in its student body. Located in the northern central part of the county, in a district which includes North Elementary, Lowrance Elementary and part of Kimberly Park Elementary, North High School has a black student enrollment which comprises 17.27% of the total student body.

All the remaining predominately white schools in the system have less than 10% blacks in their respective student bodies. A complete redrawing of the geographical attendance zones would not enhance the situation substantially because of the peculiar situation involved. This system encompasses highly urbanized and industrialized areas, suburban areas, and rural and completely undeveloped areas. The vast majority of the black students in the system live generally in the northern and eastern parts of the city. Without substantial cross-bussing, there would be no way in which to cause any great degree of racial mixing.

### 6. *The Proposed Plans*

### A. *The Larsen Plan*

Plaintiff's expert witness, Dr. Jack L. Larsen, a professor at Rhode Island College, first testified during the hearings on the matter of a preliminary injunction. At that time he presented an approach to racial mixing which, he thought, the School Board could use. If this approach had been implemented, more than one-fourth of the schools in the system would have remained with the same attendance zones or pupil assignments and some all-black and all-white schools would remain. He concluded, at that time, that, considering the size of the County and the residential patterns, his plan would accomplish a unitary school system; that it would not be practicable to transport pupils the distances that would be required in order to mix the races in all schools.

Dr. Larsen returned to testify during the hearing on the merits. With more time and with the use of additional data furnished him, he had developed a comprehensive plan which would result in a racial mix in all the schools in the system.

The proposal submitted to the Court by Dr. Larsen (see Appendix A) calls, generally, for the division of this system's elementary schools into three categories, i. e., the "inner city" elementary schools, the "middle rim" elementary schools, and the "outer rim" elementary schools. Dr. Larsen applies the satellite concept in his treatment of the "inner city" and "outer rim" schools. The usual situation would be one "inner city" school linked up with two "outer rim" schools. Then, instead of the present concept of an elementary school containing grades one through six, the two "outer rim" schools would service grades one through four, each drawing off students in those grades from the "inner city" school. The "inner city" school would serve all students from the three schools who were in grades five through six. Since the "inner city" schools are predominately black, this would necessitate the transportation of young black children for two-thirds of their elementary education for distances of from five to seventeen miles. A rough average of the distances to be traveled under this particular phase of the plan would be nine miles, with approximately 6,025 elementary students requiring additional transportation under the satellite concept.

Dr. Larsen suggests the use of express buses with adult drivers to make the trip between the schools involved. This would necessitate the students going to the school now serving their geographical zone and there being picked up by an express bus to be motored to the satellite school. In the county areas, this would mean that an individual student would have to be picked up by a local school bus, driven by a student driver and taken to a nearby school, there to await the departure of the express

bus. To alleviate the time problem, Dr. Larsen stated that the opening and dismissal hours should be staggered in the "outer rim" and "inner city" schools.

The fifteen remaining elementary schools are classified by Dr. Larsen as the "middle rim" schools. Each school within this group would house grades one through six. These schools would be divided into four groups and the existing attendance zone lines separating the schools within the same group would be abolished. Pupil assignment would be made based upon the following criteria: (1) nearness to the school, and (2) the desired racial composition of the particular school. Admittedly, this segment of the plan could not be effectively carried out without the use of pupil locator maps, which are not presently available. Due to the lack of these maps, Dr. Larsen could not be too definite about the actual distribution of students to the individual schools in these areas. But in order to achieve an acceptable degree of mixing, according to his definitions, more than likely there would have to be a substantial degree of bussing within this "middle rim" group.

Attendance on the secondary level could then be adjusted by the judicious use of feeder systems from the modified elementary schools. Here also pupil locator maps would be necessary.

Through the use of this plan, Dr. Larsen would hope to attain, as close as possible, an average of 27.5% black in every student body in the system.

For an example of how the "inner city"—"outer rim" system would work, take Group #4. This is the Rural Hall-Oak Summit-Carver Crest combination. Assuming staggered starting times of 8:30 for the "outer rim" schools and 9:00 for the "inner city" schools, the black first through fourth graders would have to arrive at the Carver Crest School at a time adequate to enable them to travel either the 11 miles to Rural Hall or the 6 miles to Oak Summit.

Then 200 would board buses to go to Rural Hall and 118 would embark on their way to Oak Summit. The 159 fifth and sixth graders, living now not more than one-half a mile from Carver Crest would arrive about an hour later to begin their school day. Meanwhile, 306 fifth and sixth graders would be gathering at Oak Summit and another 307 would be waiting at Rural Hall to catch their express buses into Carver Crest. Since a large number of the students attending County schools have to utilize transportation furnished by the school system in order to travel to the school in their district, this would necessitate two bus rides for these children, i. e., one from their home either to Rural Hall or Oak Summit, and then another one to Carver Crest. In the afternoon, the black students would be express-bussed back to Carver Crest when their day ended at 2:30. At 3:00 the white fifth and sixth grades attending Carver Crest would leave to return to their respective outlying schools. Here another problem arises. There would have to be transportation afforded these students so that they could get from Oak Summit or Rural Hall back to their homes. This would mean that the School Board would either have to invest in even more buses or let those white first through fourth graders who finished school at 2:30 wait until the express buses returned at 3:30 or later before they could be transported home.

The intricacies of this plan demonstrate the extreme difficulties involved in any attempt to attain an approximate racial mix in every school in the system. The Court finds that the undue burden which would result from the implementation of the Larsen plan, not only upon the School Board, but vastly more important, upon the students, both black and white, within this system, far outweighs any benefits which might be derived therefrom.

Furthermore, another aspect of this plan might be noted. In Beckett v. School Board of the City of Norfolk,

308 F.Supp. 1274 (E.D.Va.1969), Judge Hoffman discussed the testimony of Dr. Thomas F. Pettigrew whom the Court categorized as "undoubtedly the most outstanding and knowledgeable person in the field of sociology and race relations as related to education." Dr. Pettigrew testified that although he was a "racial integrationist," it was his opinion that the greatest single correlate of achievement in the public schools was the social class of the students attending the individual schools. He considered race, standing alone, a secondary factor. This Court takes cognizance of the fact that the particular race of a student should not be the sole factor in making a determination in this case. And for this reason also the Court does not accept the plan tendered by the plaintiffs. Additional considerations are necessary in order to view the situation in its totality and proceed on a course which has as its goal quality education for all the students of this system.

B. *The School Board Plan for 1970–1971*

The school board presented a Pupil Assignment Plan for 1970–1971 to the Court on February 16, 1970. [See Appendix B]. It retained the freedom of choice provisions which had been used in previous school years under the geographical attendance zone system, with the following modifications in transfer policies and in attendance zones. Priority would be give to those students who desired to transfer from a school in which their race was in a majority to a school in which their race would be in the minority, in other words, majority to minority requests. These requests would be honored until a school had reached an attendance level of 10% over its normal rated capacity. The normal rated capacities had been reevaluated and adjusted upward in this plan. Also included under this plan for majority to minority transfers was the offer of free school bus transportation for students so desiring who lived one and one-half miles or more from the school which they planned to attend. The majority to minority requests would be given first priority until June 1, 1970, at which time, and up to August 28, 1970, requests would be considered on a priority system based on the date of receipt of the request without regard to race. No transportation would be furnished to these students. Also no request for transfer to a school would be granted if that school had already reached its normal rated capacity.

Also, under the board's plan, Anderson, an all-black combination junior and senior high school, would be converted into a junior high school only and the approximately 400 senior high school students would be assigned to Parkland, a nearby, predominately white, senior high school.

The major change effected by the board's plan was the conversion of Carver, a predominately black school serving the levels of kindergarten through grade 12, into a junior high school. Two, contiguous, predominately white elementary attendance zones were redrawn to absorb the lower grades at Carver. These were the Mineral Springs, Oak Summit and Ibraham district and the Petree district. In turn, the junior high school attendance zones were redrawn with the result that Carver Junior High School would have a majority white student body. The 212 senior high school students who would have normally gone to Carver were reassigned to two predominately white senior high schools, North and East, whose attendance zones were adjacent to the old Carver zone.

Moreover, because of the changes in the Carver district, another elementary attendance zone which had contained three elementary schools (Ibraham, Mineral Springs and Oak Summit) was redistricted into three distinct zones, one of which, Mineral Springs, now includes a section of a predominately black attendance zone (Lowrance). This means that those Lowrance students would attend Mineral Springs Junior High rather than Hanes Junior High.

Table III reflects those approximate changes in the make-up of student bodies which would result if the School Board plan were to be implemented.

### TABLE III

| Elementary School | 1969-1970 Black | White | Black Percentage | 1970-1971 Black | White | Black Percentage |
|---|---|---|---|---|---|---|
| Carver | 706 | 3 | 99.58% | Discontinued | | |
| Ibraham | 0 | 361 | 0.00% | 235 | 361 | 39.43% |
| Lowrance | 726 | 12 | 98.24% | 558 | 11 | 98.06% |
| Mineral Springs | 48 | 833 | 5.45% | 175 | 706 | 19.84% |
| Oak Summit | 30 | 657 | 4.37% | 95 | 700 | 11.95% |
| Petree | 49 | 281 | 14.85% | 146 | 309 | 31.39% |
| | | | | | | |
| **Junior High Schools** | | | | | | |
| Anderson | 541 | 0 | 100.00% | 541 | 0 | 100.00% |
| Carver | 287 | 0 | 100.00% | 190 | 340 | 35.85% |
| Hanes | 500 | 13 | 97.47% | 423 | 13 | 97.02% |
| Mineral Springs | 28 | 890 | 3.05% | 127 | 678 | 15.77% |
| Walkertown | 45 | 622 | 6.75% | 46 | 433 | 9.60% |
| | | | | | | |
| **Senior High Schools** | | | | | | |
| Anderson | 402 | 0 | 100.00% | Discontinued | | |
| Carver | 240 | 0 | 100.00% | Discontinued | | |
| East | 65 | 1474 | 4.22% | 112 | 1474 | 7.06% |
| North | 305 | 1461 | 17.27% | 405 | 1461 | 21.70% |
| Parkland | 61 | 1461 | 4.01% | 497 | 1453 | 25.49% |

[A2709]

### 7. *Faculty Desegregation*

On January 14, 1970, the Winston-Salem/Forsyth County Board of Education, by resolution, and without Court order,[8] initiated a plan to further desegregate the faculty in the school system effective January 23, 1970, in accordance with the guideline established in Nesbit v. Statesville City Board of Education, 4 Cir., 418 F.2d 1040 (1969). The plan went into effect on January 26, 1970.

Approximately 2,100 teachers are employed in the system, and approximately 26 per cent of the total are black teachers. Now the proportion of Negro teachers, with two exceptions brought about by appeals to the School Board, in each school approximates the proportion of black teachers to white teachers in the whole system. Beginning with 1964, the Board first assigned teachers across racial lines, and this practice has increased each year as follows:

| | |
|---|---|
| 1964 | 8 |
| 1965 | 12 |
| 1966 | 107 |
| 1967 | 124 |
| 1968 | 199 |
| 1969 | 296 |

8. While this Court did on January 19, 1970, enter an order directing the Board to integrate the faculty in accordance with the mandate of *Nesbit*, such should not mitigate in the least the Board's action, as the Court's action was prompted by press reports that action was about to ensue to enjoin the teacher reassignment plan of the Board.

The reassignment plan for teachers, put into effect on January 26, 1970, involved a transfer of approximately 425 teachers. Nevertheless, the number of teachers teaching across racial lines by assignment of the Board had increased steadily over some years and by 1969 was approximately 15 per cent, i. e., 296 out of 2,100.

In order to effect a plan of faculty desegregation, a committee of 17 people from within the system was formed. Various exceptions were made and any teacher falling in one of these exceptions could not be transferred. Those teachers and other personnel that would be excluded were:

(a) anyone who would be 65 by July 1, 1971;

(b) principals and assistant principals approved by the school board;

(c) special education teachers and those who worked with the retarded and handicapped;

(d) the one teacher in the experimental program;

(e) those already teaching across racial lines;

(f) continuing education instructors;

(g) those teachers involved at Central Rehabilitation;

(h) music teachers and librarians who would be placed in a separate pool;

(i) the principals could select 20% of their original faculty to remain, so that a nucleus could be retained at each school.

For a complete tabulation of the results of the faculty desegregation plan for the year 1970 see Appendix C. For the purposes of this tabulation, Central Rehabilitation and the Children's Center were eliminated because there were no teachers who could be matched with others in order to make an exchange— these teachers have students who are physically handicapped. There are four teachers who are provided by the system. The Board has no control over the actual operation of the facility. Central School is primarily for handicapped students at the junior and senior high school level.

At the elementary level the ratio of black to white faculty is 29.98% black to 70.02% white. The range within which the black faculty ratio spans under the reassignment plan is 16.67% at the Children's Home to 38.46% at North Elementary. [At the Children's Home the plan had been originally to assign a third black teacher, but there was a resignation.]

At the junior and senior high schools. [excluding the combination schools, i. e., Anderson (7–12), Carver (7–12) and Mount Tabor (9–12)] the span for the black faculty is 19.94% at Dalton to 33.-33% at Kennedy. The range at the senior high school level is 14.49% at East to 31.25% at Atkins.

In the combination schools of Anderson and Carver, the adjustment of ratios was made difficult because of the small size of the student bodies and the wider range of subjects which an individual on the faculty would have to teach. Therefore, under the plan, the Anderson faculty was 40% black and the Carver faculty was 45.83% black.

8. *Transportation*

Generally speaking, no transportation is provided at the present time for pupils attending schools in the City of Winston-Salem. Transportation is provided for pupils who attend schools outside the 1957 corporate limits of the City of Winston-Salem and who live 1½ miles or more from school, but no transportation is provided for pupils attending schools inside the 1957 corporate limits of the City. The school system has 216 buses, and transports about 18,104 pupils each day at an annual cost of approximately $370,000.00. $110,000.00 is paid by the Local Board, the remainder by the State Board. All bus routes are designed to serve the pupils in the school attendance area in which the bus is assigned. Pupils are assigned to buses without regard to race or color. Buses do not pick up pupils outside the attendance boundaries of the school served by

the bus. However, if a pupil transfers to a school outside his own attendance area he may catch a school bus at any regular pick-up point within the attendance area of the school to which he transfers. A pupil who resides less than 1½ miles from school may also catch the bus at any regular pick-up point.

The case of Sparrow v. Gill, 304 F. Supp. 86 (M.D.N.C.1969), decided by a three-judge court, will require the State of North Carolina to eliminate the 1957 corporate boundary limitation and to either provide transportation only outside municipalities or to all students who live more than a specified distance from school, without regard to corporate boundaries. The injunction ordered as a result of this opinion will be in effect at the beginning of the 1970–1971 school year. It is apparent from information gained through the news media that funds will be available for intra-city transportation during the 1970–1971 school year.

### 9. *Curriculum*

The curriculum in the elementary and junior high schools is basically the same. The curriculum in the senior high schools is based upon the demand for the various courses which are offered each year in the spring. Some of the courses given in the predominately white high schools are not given in the predominately Negro schools and vice versa. Every student who expresses a desire to take any course not offered in his particular high school is contacted personally and arrangements are made to allow him to take that course. This may be done by having him transferred to a school offering the course or by allowing him to go to that school for the specific purpose of taking the course. There is no evidence that by increasing the number of Negroes attending school with whites, the opportunity of any student to take any course would be enhanced.

The greatest variation in curriculum occurs in those schools in low-income areas which receive additional funds

through Title I of the Elementary and Secondary Education Act for a variety of special reading and other compensatory education programs. These programs are concentrated in 17 schools, 15 of which are predominately or all black. The current year's budget for Title I programs is $863,419.00, which when divided among the 2,817 eligible pupils results in a per pupil expenditure of $306.00. Title I programs are directed at eligible students, rather than eligible schools, but they can be more effectively administered when the eligible students are concentrated in a relatively small number of schools. Further, some of the programs have residual benefits for pupils who are not themselves eligible. In addition, the School Board operates or proposes to implement several other programs that will be concentrated in the predominately Negro schools. At least one of these programs, the Model Cities Education Program, with a budget of $696,704.00 and a per pupil expenditure of $898.00 is directed at eligible schools rather than eligible pupils and would be administered in the North Elementary School no matter who attended it.

Pupils receiving the benefit of teaching aids and materials and of concerted compensatory or remedial programs under Title I, ESEA, are receiving educational benefits not currently available throughout the system.

### 10. *Athletics and other Activities*

All school-connected services, facilities, athletics, activities and programs are open to each student on a desegregated basis. A student assigned to a new school is not subject to any disqualification or waiting period for participation in activities and programs, including athletics.

Interscholastic athletic competition is open to all schools without discrimination. The predominately white schools engage in athletic competition with the predominately or all-black schools.

11. *The Racial Make-Up of Neighborhoods and Public Housing*

It has not been shown that the School Board's plan of geographic zoning was established in any way by reference to the race of the inhabitants of the various zones. When the Board decided to discontinue Paisley Senior High School, new zone lines were deliberately drawn to increase integration at Reynolds and North High Schools. Four schools have changed in their racial makeup since they were opened, three of these since 1960. These four are Skyland, Lowrance, North Elementary and Hanes Junior High School. These schools were formerly all-white and are now black or predominately black because of change in residential make-up of the neighborhood. However, unless people are required to live in "racial balance," the homogeneous quality of zones will be constantly changing. The population shifts show conclusively that black citizens have been able to acquire residences in those areas inhabited by white citizens, limited only by their economic ability and desire to do so. In early days, ordinances were adopted to restrict the areas in which Negroes could reside, but the ordinances have not been enforced, nor have they had any apparent effect upon the movement of Negroes into other areas. The factors affecting the movement or lack of movement by Negroes have not been legal in nature, but rather, sociological and economic. As early as 1914, the Supreme Court of North Carolina in State v. Darnell, 166 N.C. 300, 81 S.E. 338 (1914), a case involving the City of Winston, held such an ordinance unconstitutional. Another attempt at racially oriented zoning was made in 1930, but this also was struck down by the North Carolina Supreme Court in 1940. Clinard v. City of Winston-Salem, 217 N.C. 119, 6 S.E.2d 867. There is no evidence as to whether or not either ordinance was ever enforced, but, regardless of that, none of the area zoned for whites in the 1912 ordinance is occupied by whites today, and much of the area zoned for whites in the 1930 ordinance is now occupied by blacks. Further, the urban area of Winston and of the Winston-Salem of those days was but a fraction of the 57.5 square miles which comprise the City today. Plaintiffs' evidence showed, and the Court finds, that substantial population shifts occurred between 1960 and 1969, clearly demonstrating that blacks have been able to acquire places of residence in areas in which whites have traditionally lived in Winston-Salem.

William H. Andrews, Director of Community Services for the local Redevelopment Commission, and a member of the black race, testified that the Commission followed a strictly non-discriminatory policy in locating places of residence for persons displaced by urban redevelopment and had done so since 1961 when the local Commission was organized; that blacks have not been denied access to any area by reason of race; that the Commission receives real estate listings throughout Winston-Salem and has assisted over 1500 families, all black, to relocate wherever they wished.

A number of public housing or redevelopment projects have been completed in Winston-Salem in the last several years, underwritten with federal funds for those in low income brackets. Among such projects are: Happy Hill Gardens, Kimberly Park Terrace, Piedmont Park and Cleveland Avenue Homes. In these four projects are 1,538 units, rentable to all races. These projects are located in now predominately Negro neighborhoods in response to the demand for housing there and are occupied predominately by those of the Negro race. In resettling displaced Negro families, practically all such families requested officials of the housing authority to seek homes for them in the same locality from which they were displaced. The School Board has no control as to the location or to the occupancy of these federally subsidized projects. Thus the federal government acts to meet a housing need in a community without regard to "housing balance," and multiplying many times the

difficulty for the School Board to accomplish a "balance."

### 12. Operation, Direction and Control of the Winston-Salem/Forsyth County School System

In addition to the Winston-Salem/Forsyth County Board of Education, the plaintiffs also named as defendants the Board of County Commissioners of Forsyth County, the North Carolina State Board of Education, and Dr. Charles F. Carroll, State Superintendent of Public Instruction. [Dr. Craig Phillips succeeded Dr. Carroll as Superintendent and under Rule 25(d) (1) of the Federal Rules of Civil Procedure was automatically substituted as a party defendant.]

The evidence shows that both the Forsyth Board of County Commissioners and the State of North Carolina appropriate funds based on a budget prepared by the local School Board. These appropriations are made on a statistical and nondiscriminatory basis. The local School Board directs, controls and supervises the school system and is so vested with such power and authority by Chapter 115 of the General Statutes of North Carolina.

The evidence in this case is totally devoid of proof that the schools in this school system are administered and controlled by other than the Winston-Salem/Forsyth County Board of Education. Even if by inference it could be deducted that there is some control, then there is no showing of discrimination by either the Forsyth County Board of Commissioners, the State Board of Education or by the State Superintendent of Public Instruction.

The Court finds as a fact that whatever relief the plaintiff may be entitled to pursue can be sought just as expeditiously, and whatever remedies the plaintiffs may be entitled to receive can be enacted just as effectively through their suit against the local School Board. The local Board is the focal point in the operation of this school system.

### DISCUSSION

■■ The Board must maintain the ratio of black to white faculty members of each school in approximately the same ratio as the ratio throughout the system. Nesbit v. Statesville Board of Education, 4 Cir., 418 F.2d 1040 (1969). Though there are numerous specific allegations of discrimination in practically all facets of the operation of the schools, basically the issues arising from the evidence and for the Court to decide are the following:

As provided under the Pupil Assignment Plan of the Board for the school year 1970–1971: (1) has the Board used all reasonable means to integrate the schools in their jurisdiction, and (2) has the Board taken adequate measures to assure that no pupil is excluded from any school on the basis of race?

It is concluded that Swann, et al. v. Charlotte-Mecklenburg Board of Education, et al., 4 Cir., 431 F.2d 138 (decided May 26, 1970) dictates that these are specific issues that must be resolved as to those school plans involving large black residential areas where the Board contends that all schools cannot be integrated by using reasonable means.

■ It is no longer a matter of dispute that school boards have a duty to convert to a unitary school system in which racial discrimination is eliminated "root and branch." Green v. School Board of New Kent County, 391 U.S. 430, 437, 88 S.Ct. 1689, 20 L.Ed. 2d 716 (1968). Then more recently, in Alexander v. Holmes County Board of Education, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), a unitary school system was defined as one "within which no person is to be effectively excluded from any school because of race or color." After *Alexander*, in Northcross v. Board of Education of Memphis, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970), the Chief Justice in a separate but concurring opinion recognized that the definition of a unitary system set forth in prior cases leaves open some practical problems such as, among others, "to what

extent transportation may or must be provided to achieve the ends sought by prior holdings of the Court."

*Green* established that all facets of a school system, six in number, must be desegregated, i. e., student bodies, faculty, staff, transportation, extra-curricular activities and facilities. The evidence demonstrates, and the Court so finds, that the Winston-Salem/Forsyth County Board of Education is operating this system in compliance with five of the six divisions of school operation, leaving only the question of student composition.

While it is not conceded by the plaintiffs that the Board has always acted in "good faith," it is significant that:

(1) In 1957, the Winston-Salem Board of Education (before the merger of the County and City systems in 1963) starting with Reynolds High School, one of the outstanding high schools in this State, started a program of desegregation. In the 1969–1970 school year, Reynolds pupil population consisted of 255 blacks and 1456 whites.

(2) Negroes consistently served on the respective Boards prior to the merger of the two systems and on the Winston-Salem/Forsyth County Board since the merger.

(3) The number of children attending integrated schools has steadily increased through the years.

(4) HEW consistently and without exception approved the plan of operation of the system until litigation ensued when, by reason of the litigation, the submission of plans was not required.

(5) After the decision in *Nesbit*, the Board moved voluntarily to integrate the faculty in the ratio of black to white as there spelled out. Prior thereto, there was substantial faculty integration.

(6) The Board initiated and supported a bond election resulting in 24.8 million dollars being voted in March, 1968, for bonds for school construction and equipment. As is done in most cases, and wisely so, where large sums of money are voted, definite and specific plans for the expenditure of the entire 24.8 million dollars were not made. This makes sense when large sums are voted requiring much time for planning and execution of the plans. Such sums seldom can be prudently spent at once and are best utilized in segments. Initial projects proposed for the money would have resulted in increased integration in the schools. The bonds are not now marketable by reason of the litigation and none have been sold. When the issues in this litigation, and in Allen (formerly Atkins) v. North Carolina State Board of Education, et al. (M.D.N.C. #C–72–WS–68) can be resolved, the Board plans to build two high schools with part of the proceeds from these bonds, one in the northeast quadrant of the administrative unit and the other in the southeast quadrant. Atkins High School, a school now serving all-black students could then be closed.

(7) The Board has sought and received advice and help from various study groups and experts in devising reasonable procedures and plans to desegregate the schools and to further the total educational program.

(8) The Board has diligently sought and received funds from available sources to establish and promote special education programs. Most of the funds

received have been spent in the predominately black schools.

(9) The Board closed Paisley Senior High School and reassigned the pupils to increase racial mixing.

(10) It has gerrymandered zone lines to promote desegregation.

(11) It operates its athletics program on an integrated basis.

■■■■ Upon the Board rests the burden to demonstrate that the school buildings attended only by black children and only by white children are not the result of discrimination and meet the reasonableness test. Undoubtedly, the Board has made a determined effort to overcome the many problems concerned with the desegregation of the schools. The question is has it done enough. Given adequate buses and personnel, the schools certainly could be put in "racial balance." While the evidence does not show how many students must be bussed to implement the Larsen plan, a study of the exhibits leaves no doubt that massive bussing would be required if the plan were adopted. It is the conclusion of the Court that constitutional principles do not require the extreme measures necessary to effect a "racial balance" in all the schools in this system required by the Larsen plan or such other plan as will accomplish a racial balance.

One can easily discern that neither the children nor parents of either race object to the mixing of the races, but there is fervent objection to wholesale bussing by both races, black and white, children and parents. Such groundless usurpation of time and expenditure of school funds is unwarranted and difficult of explanation. This is not to intimate that popular objections can dictate the requirements of the Constitution.

Under the pupil assignment plan for 1970–71, students are assigned on the basis of geographic attendance zones with free transfer but to promote further integration, it is provided that

(1) priority be given to requests for transfer from a school in which the pupil's race is in the majority to a school where the pupil's race is in the minority;

(2) majority to minority requests are to be honored even though such results in overcrowding, up to 10 per cent above the normal rated capacity of the school; and

(3) free school bus transportation is available to pupils who make majority to minority transfers if they live one and one-half miles or more from the school to which they transfer.

■■■■ Upon consideration of the Board's freedom of transfer policy, it is concluded that while the above provisions tend to promote integration, the continuation of the policy of permitting any child to transfer may be expected to encourage resegregation. The Board's policy should be altered so that a pupil who is a member of a minority race in the geographic attendance zone of that pupil's residence shall be assigned to the school in the geographic attendance zone of his residence and shall not be allowed to transfer to a school in a zone where he would be in a majority racial enrollment. There should be an exception to this rule in special education programs and in special individual hardship cases.

■■■■ The schools in the subject school system were built on the then acceptable premise of locating the schools where the children were located. It is clear that the neighborhood concept cannot be approved if residence in a neighborhood is denied to black pupils on the ground of color. Brewer v. School Board of City of Norfolk, 4 Cir., 397 F.2d 37, 42 (1968), but on the other hand, it is equally clear that now residence cannot be denied in any neighborhood because of race or color. Closely allied with the neighborhood school concept is geographical zoning, as provided in this system. Geographical zoning is an approved method for the assignment of pupils, but such may not serve as a guise to foster racial segregation.

The Board strenuously contends that there has been no gerrymandering of the zone boundaries, and that the attendance zones are drawn based on nonracial criteria except where efforts were made to increase integration. On the other hand, the plaintiffs contend that the attendance zones are drawn to foster racial segregation. The Court finds no evidence to support the contention of the plaintiffs. Instead, it appears that the boundaries of the zones are drawn so that the pupils attend the school nearest their residence, recognizing natural boundaries, barriers and obstacles that might endanger the children, such as heavily traveled streets. Nevertheless, as will be later pointed out, there are two areas in the school system which the Court concludes will not meet the "reasonableness test" established in Swann, et al. v. Charlotte-Mecklenburg Board of Education, et al., *supra*.

While the record is not replete with proof that there has been private discrimination, the Court fairly must accept as a fact that earlier there has been some private discrimination in the sale and purchase of property located within the school system. There is evidence that more than twenty years ago ordinances existed in the City of Winston-Salem defining areas where black and white could live. However, these ordinances have long since been declared unconstitutional[9] and have never been really enforced, certainly not in the last two decades. The evidence is that several neighborhoods in the City of Winston-Salem have changed from all-white or predominately so to predominately black, to-wit, the Bon Air area, the area surrounding the Old City Hospital, and an area in northeast Winston-Salem. An area known as Morningside Manor, located in the southeastern part of the City of Winston-Salem, developed within the last fifteen years, more or less, is inhabited by both blacks and whites. Areas surrounding North Elementary School and Hanes Junior High School have changed from predominately white to predominately black. Within the last three weeks, a feature story appeared in the local daily paper showing photographs of Negro families living in the western and northwestern sections of the City.

The reasonable conclusion to be drawn from the evidence is that even though in times there has been some discrimination in the sale and rental of property, the concentration of the Negro population in the northeastern quadrant of the City has been caused by economic factors and the desire of blacks to live in the areas where they do live rather than in white or predominately white areas. This conclusion is confirmed by the fact that in resettling displaced blacks as a result of public housing projects that without exception the blacks asked to be resettled in the same area they lived, that is, in black or predominately black areas even though other areas were open. The concentration of blacks cannot be fairly attributed to public and private discrimination, and it is concluded that the housing patterns are not the result of such discrimination. In any event, where de jure segregation has been eliminated and de facto segregation remains, there surely must come a time when the stigma of de jure segregation is removed, certainly so in this situation, particularly in those areas once populated by whites and now all-black or predominately black.

In a school system where so many black pupils attend school with white pupils, where in each school black and white teachers work hand in hand, and where athletes, black and white, make up the teams in the majority of the

9. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 dec'd in 1968, bars all racial discrimination, public and private, in the sale and rental of property.
State v. Darnell, 166 N.C. 300, 81 S.E. 338 (1914) held a 1912 Ordinance of the City of Winston providing for segregation of the races unenforceable in that the ordinance was adopted without authority. Also, a 1930 zoning ordinance providing for segregation was removed in 1940.
Clinard v. City of Winston-Salem, 217 N.C. 119, 6 S.E.2d 867.

schools, it is difficult to believe that a Negro child seeing this, as he must, would believe that a dual system of schools is being operated.

The plethora of decisions in the area of school integration indicates the difficulty in determining what constitutes an effective disestablishment of a dual school system. The formulation of definite rules and guidelines is difficult, if not virtually impossible. The task facing the nation, not merely the South, is to·respond and continue to respond to the *Brown* decision in the light of the circumstances in each case. The Board in the subject case has shown a consistent approach toward a unitary system. Its actions have not been haphazard and belated, responding only after judicial and administrative coercion. While good faith cannot be a substitute for effective desegregation, good faith is a vital element in properly evaluating local judgment in devising compliance plans. Orderliness brings stability and stability promotes the educational process, the education of children being the polar star of any properly run school system.

The plaintiffs cite *Green,* among other cases, as authority for their position. The fact situation here is vastly different. There were only two schools in New Kent County, one white and one black. Buses met or passed each other en route to school, carrying either all black pupils or all white. Dual bus routes were the rule. The residences were mixed with no concentration of black citizens in any particular area. The distinction between the system in New Kent County and the system here is obvious and needs no elaboration.

The decision of this Circuit in Swann v. Charlotte-Mecklenburg Board of Education, et al., *supra,* applies "the test of reasonableness" and must be followed in arriving at a decision in this case. Though as set forth in the findings of fact herein, there are. natural boundaries which tend to support the zones provided for Diggs Elementary, Kimberly Park Elementary and Cook Elementary (Carver Crest), it is the opinion of the Court that by redrawing the zone lines, pairing, clustering, or using other methods available to the Board, that a reasonable integration could be accomplished in each of these schools. Under the proposed plan of the Board for these schools for the 1970–1971 school year, each of the aforementioned schools remains with an all-black enrollment. Practical difficulties cannot alter constitutional requirements, and it is concluded that by reasonable means, considering the proximity of these schools to adjoining white areas, white enrollment in each of the three schools can be accomplished. The problems involved in doing so are not in any manner comparable to the problems involved in changing the racial composition of schools such as Brown, Fourteenth Street, Mebane and others. It is recognized that in order to accomplish an integrated student body at Diggs, Kimberly Park and Cook there will of necessity be changes in the racial composition in other schools.

## CONCLUSIONS OF LAW

1. The area attendance zones of each school in the Winston-Salem/Forsyth County School Administrative Unit have been drawn without discrimination as to race or color and with due regard to all circumstances existing in each school area. Nevertheless, all reasonable means as required by Swann v. Charlotte-Mecklenburg Board of Education, supra, have not been utilized to change the racial composition at Diggs Elementary, Kimberly Park Elementary and Cook Elementary (Carver Crest).

2. Under the plan of operation submitted by the Board for the 1970–1971 school year, there will result some all-white and some all-black schools. This fact, however, will not

invalidate the plan because the large black residential areas in the City of Winston-Salem are such that reasonably all schools cannot be integrated. Remedies other than Court imposed are available to correct this situation, e. g., the more extensive use of the right of transfer or changes in the residential pattern, or both.

3. Upon proper compliance with the direction of the Court herein with reference to Diggs Elementary, Kimberly Park Elementary, Cook Elementary (Carver Crest) no person will be excluded from any school because of race or color.

4. The plan of the Board for the operation of the three schools mentioned in Paragraph 3 first above does not comply with recently enunciated constitutional principles in this Circuit, and the racial composition in these schools must be changed.

5. Except in the area of pupil composition, the Board's plan effects a unitary system.

6. In accordance with Finding of Fact No. 12, the action should be dismissed as to the defendants Board of Commissioners of Forsyth County, North Carolina State Board of Education and Dr. Craig Phillips, State Superintendent of Public Instruction.

7. The Board's freedom of transfer policy should be altered so that a pupil whose race is in a minority in the school to which he is assigned under the plan of assignment shall not be allowed to transfer to a school in a zone where he would be in a majority racial enrollment with due consideration given to the exceptions stated in the foregoing Memorandum.

8. The revised plan for the 1970–1971 school year should include such innovative programs as the Board can devise to increase contact between the races.

9. The Board must continue faculty assignments as previously ordered.

10. To further refine its unitary system, the Board should forthwith proceed to plan for the construction of the two high schools, one in the northeast quadrant of the administrative unit and one in the southeast quadrant.

In addition to the above enumerated conclusions of law, the Court incorporates herein by reference those conclusions of law appearing in the section of this Memorandum entitled "Discussion" and which are not specifically set forth by number in this section.

ORDER

Pursuant to the foregoing Memorandum, it is ordered and decreed that:

1. The Winston-Salem/Forsyth County Board of Education file a revised plan for the operation of its schools within twenty (20) days of the date of this Order.

2. The revised plan shall include the following:

(a) A provision that a pupil whose race is in a minority in the school to which he is assigned under the plan of assignment shall not be allowed to transfer to a school in a zone where he would be in a majority racial enrollment. Excepted from this rule will be those students in special education programs and special individual hardship cases.

(b) Reasonable integration of Diggs Elementary, Kimberly Park Elementary and Cook Elementary (Carver Crest).

(c) A summary of innovative programs to increase contact between the races.

3. The Winston-Salem/Forsyth County Board of Education will forthwith proceed to formulate, adopt and execute plans for the construc-

tion of one high school in the northeast quadrant of the school administrative unit and one in the southeast quadrant.

4. The action is dismissed as to the defendants, Board of Commissioners of Forsyth County, North Carolina State Board of Education and Dr. Craig Phillips, State Superintendent of Public Instruction.

5. Within seven (7) days after the Board has filed the revised plan, the plaintiffs will file such exceptions, if any, as they desire.

6. Unless specific demand is made for further hearing within three days after the filing of exceptions or thirty days after the date of this Order, whichever shall first occur, the Court will enter an Order relative to the revised plan.

7. Since prompt action is essential, such order as shall be entered by this Court after the filing of the revised plan shall remain in full force and effect unless modified by an order of this Court or the United States Court of Appeals for this Circuit.

## APPENDIX A

## A SUGGESTED PLAN FOR DESEGREGATION OF THE WINSTON-SALEM/FORSYTH COUNTY PUBLIC SCHOOLS

J. L. Larsen, Ph. D.
Professor of Education
Rhode Island College

### Part I

Elementary School Desegregation

#### Objectives

The suggested plan for complete elementary school desegregation is based upon fulfillment of three basic objectives.

1. All elementary schools in the district will be desegregated.

2. Quality education will be maintained and increased as the district moves toward integrated education.

3. Total elementary school desegregation will be accomplished with a minimum of pupil transportation. Inasmuch as possible students will attend the school nearest their homes, consistent with objective # 1 above.

#### Definitions

For purposes of this suggested plan the following definitions will apply:

1. A *desegregated* school is one in which the racial composition of the student body reflects within a range of ten percentage points the racial composition of that grade level in the district as a whole. (It is worth noting that this was the logical formula on which the Board based its faculty desegregation policy.)

2. A *segregated* school is one in which the minority race constitutes less than ten percent of the student body.

3. A *racially mixed* school is one in which the minority race of the student body is more than 10% of the total but less or more than the range appropriate for a 'desegregated' school.

#### Approach to School Desegregation

This plan approaches the task of desegregating elementary education through a categorization of the forty elementary schools presently in the system.

### Table 1

#### "Inner City" Elementary Schools

| School | *Present Enrollment | | | Site | Capacity | Year of |
| | White | Negro | Total | Acreage | | Construction |
|---|---|---|---|---|---|---|
| Brown | 0 | 663 | 663 | 16.0 | 830 | 1914 |
| Carver Crest | 0 | 477 | 477 | 9.5 | 636 | 1950 |
| Fairview | 0 | 693 | 693 | 15.2 | 720. | 1962 |
| Fourteenth St. | 0 | 583 | 583 | 8.0 | 1046 | 1922 |
| Mebane | 0 | 504 | 504 | 5.0 | 546 | 1928 |
| Skyland | 0 | 483 | 483 | 19.8 | 750 | 1923 |
| North | 0 | 689 | 689 | 13.5 | 870 | 1923 |

*All enrollment figures on this and subsequent tables
were drawn from the December 1969 enrollment data
released by the Board of Education.

### Table 2

#### "Middle Rim" Schools

| School | Present Enrollment | | | Site | Capacity | Year of |
| | White | Negro | Total | Acreage | | Construction |
|---|---|---|---|---|---|---|
| Diggs | 0 | 609 | 609 | 12.0 | 733 | 1953 |
| Kimberly Park | 0 | 778 | 778 | 7.4 | 720 | 1966 |
| Lowrance | 12 | 726 | 738 | 6.5 | 696 | 1955 |
| Ardmore | 586 | 7 | 593 | 7.7 | 705 | 1929 |
| Brunson | 540 | 135 | 675 | 7.5 | 720 | 1959 |
| Forest Park | 647 | 20 | 667 | 17.6 | 728 | 1924 |
| Ibraham | 361 | 0 | 361 | 25.0 | 505 | 1956 |
| Latham | 415 | 7 | 422 | 12.5 | 564 | 1957 |
| Mineral Springs | 832 | 48 | 880 | 12.0 | 870 | 1948 |
| Moore | 438 | 0 | 438 | 9.0 | 746 | 1950 |
| Petree | 280 | 49 | 329 | 11.0 | 487 | 1923 |
| Sherwood Forest | 822 | 1 | 823 | 21.0 | 720 | 1962 |
| South Park | 536 | 4 | 540 | 12.8 | 715 | 1922 |

[A2710]

Table 2 (Cont.)

"Middle Rim" Schools

| School | Present Enrollment | | | Site Acreage | Capacity | Year of Construction |
| --- | --- | --- | --- | --- | --- | --- |
| | White | Negro | Total | | | |
| Speas | 996 | 2 | 998 | 16.0 | 755 | 1961 |
| Whitaker | 608 | 7 | 615 | 19.0 | 708 | 1954 |
| *Carver Elem. | 0 | 350 | 350 | | | |
| | 7073 | 2743 | 9816 | | | |

* Carver Elementary School will be closed. 350 of its students will be assigned to schools in this category. It is suggested that 200 be assigned to Ibraham and 150 to Petree.

Total white students in "Middle Rim" attendance areas -- 7073
Total Negro students in "Middle Rim" attendance areas -- 2743

% Negro students -- 27.9%

Table 3

"Outer Rim" Elementary Schools

| Schools | Present Enrollment | | | Site Acreage | Capacity | Year of Constr. |
| --- | --- | --- | --- | --- | --- | --- |
| | White | Negro | Total | | | |
| Bolton | 520 | 1 | 521 | 10.0 | 480 | 1966 |
| Clemmons | 972 | 14 | 986 | 12.0 | 890 | 1925 |
| Griffith El. | 1020 | 0 | 1020 | 12.0 | 1160 | 1927 |
| Kernersville | 1111 | 36 | 1147 | 13.5 | 1130 | 1926 |
| Lewisville | 602 | 29 | 631 | 10.0 | 726 | 1947 |
| *Oak Summit | 657 | 230 | 887 | 30.6 | 939 | 1929 |
| Rural Hall | 871 | 50 | 921 | 23.0 | 875 | 1923 |
| Sedge Gardens | 935 | 7 | 942 | 11.0 | 920 | 1919 |
| South Fork | 691 | 2 | 693 | 17.0 | 595 | 1928 |
| Union Cross | 659 | 3 | 662 | 10.0 | 655 | 1927 |
| Vienna | 423 | 12 | 435 | 24.0 | 595 | 1956 |
| Walkertown | 916 | 92 | 1008 | 18.0 | 1108 | 1924 |
| Waughtown | 358 | 2 | 360 | 19.0 | 393 | 1954 |

*It is suggested that 200 of the Carver Elementary students be assigned to Oak Summit Elementary School. The figures above include these Carver students.

[A2711]

---

*The Problem and the Method of Desegregation*

In line with the objectives cited earlier the plan attempts to desegregate elementary education in the most logical manner, employing the least amount of pupil transportation and utilizing the present school buildings. Essentially the approach to the objectives is two-pronged.

1. The first prong of the plan desegregates twenty of the district's elementary schools through combining the seven black schools of the "inner city" with thirteen predominantly white schools of the "outer rim." This approach results in twenty school buildings in which the student population ranges from 23% Negro to 36% Negro. The plan is spelled-out later in this report under the section entitled "Inner City/Outer Rim." See Tables 1 and 3 for a listing of the school buildings involved in the approach.

2. The second prong of the plan desegregates the sixteen schools of the "Middle Rim" through a redrawing of the school attendance area boundaries. These school attendance areas, contiguous to each other but now largely segregated by race, house a total of 9816 students. Of this number, 2743 or 27.9% are Negro. Through use of a pupil locator map and computer programs these school attendance areas can be redistricted by pupil assignment to a point where each building would house a student population of 17%–37% Negro. In large part these buildings can remain "walk-in" schools although some minor shuttle bussing may be required. (Carver Elementary School must be counted as one of the sixteen in order to account for its students. It has been recommended that the Carver Elementary School be closed and the building become a secondary school housing grades 7–12).

*"Inner City/Outer Rim" Combinations*

This section of the plan outlines the combinations of schools of the inner city and outer rim in such a way as to achieve desegregation. This results in seven groupings of three schools in each group. Within each group the "inner city" school becomes a 5th–6th grade school and each outer rim school becomes a 1st–4th grade school. Present attendance area lines are not redrawn. Figures used are those presently listed for the attendance area cited, and in proportion to the number of grade levels. Table 4 presents the data and groupings.

### Table 4

### "Inner City/Outer Rim" Groupings

#### Group #1

Waughtown Elementary School -- Capacity - 393

from Waughtown attendance area all students in grades 1-4 --- 240

from Mebane attendance area students in grades 1-4 --- 120
360 (35% Negro)

Union Cross Elementary School -- Capacity-655

from Union Cross attendance area all students in grades 1-4 --- 441

from Mebane attendance area students in grades 1-4 --- 212
653 (32% Negro)

[A2712]

Table 4 (cont.)

"Inner City/Outer Rim" Groupings

Group #1

Mebane Elementary School Capacity-546

from Mebane attendance area all
students in grades 5-6 -- 172

from Waughtown attendance area
all students grades 5-6 -- 120

from Union Cross attendance area
all students grades 5-6 -- 221
 513 (33% Negro)

Group #2

Sedge Gardens Elementary School - Capacity-920

from S. Gardens attendance area
all students in grades 1-4 --- 628

from Skyland attendance area
students in grades 1-4 --- 200
 828 (24% Negro)

Kernersville Elementary School - Capacity-552 (in part)

from Kernersville attendance area
half of students in grades 1-4 -- 384

from Skyland attendance area
students in grades 1-4 -- 120
 504 (23% Negro)

Skyland Elementary School - Capacity-750

from Skyland attendance area
all students in grades 5-6 -- 168

from Kernersville attendance
area half of students grades 5-6 - 192

from S. Gardens attendance
area all students grades 5-6 -- 314
 674 (24% Negro)

Group #3

Walkertown Elementary School - Capacity-1108

from Walkertown attendance area
all students in grades 1-4 --- 672

from Fairview attendance area
students in grades 1-4 --- 300
 972 (30% Negro)

Table 4 (Cont.)

"Inner City/Outer Rim" Groupings

Group #3

Kernersville Elementary School -- Capacity-550 (in part)

 from K'sville attendance area half
 of students in grades 1-4 --- 384

 from fairview attendance area
 students in grades 1-4 --- 162
 546 (29% Negro)

Fairview Elementary School -- Capacity-693

 from Kernersville attendance area
 half of students in grades 5-6 -- 192

 from Walkertown attendance area
 all students in grades 5-6 -- 336

 from Fairview attendance area
 all students in grades 5-6 -- 231
 759 (30% Negro)

Group #4

Rural Hall Elementary School -- Capacity-875

 from Rural Hall attendance area
 all students in grades 1-4 -- 614

 from Carver Crest attendance area
 students in grades 1-4 -- 200
 814 (24% Negro)

Oak Summit Elementary School -- Capacity-687

 from Oak Summit attendance area
 all students in grades 1-4 -- 591

 from Carver Crest attendance area
 students in grades 1-4 -- 118
 709 (28% Negro)

 from Oak Summit attendance area
 all students in grades 5-6 -- 306

 from Rural Hall attendance area
 all students in grades 5-6 -- 307

 from Carver Crest attendance area
 all students in grades 5-6 -- 159
 772 (30% Negro)

Group #5

South Fork Elementary School -- Capacity-595

 from South Fork attendance area
 all students in grades 1-4 -- 462

 from North attendance area
 students in grades 1-4 -- 260
 722 (36% Negro)

[A2713]

Table 4 (Cont.)

"Inner City/Outer Rim" Groupings

<u>Group #5</u>

Bolton Elementary School -- Capacity-480.

 from Bolton attendance area
 all students in grades 1-4 -- 347

 from North Attendance area
 students in grades 1-4 -- <u>200</u>
 547 (36% Negro).

North Elementary School -- Capacity-870

 from North attendance area
 all students in grades 5-6 -- 230

 from South Fork attendance area
 all students in grades 5-6 -- 231

 from Bolton attendance area
 all students in grades 5-6 -- <u>174</u>
 635 (36% Negro)

<u>Group #6</u>

Griffith Elementary School -- Capacity-1160

 from Griffith attendance area
 all students in grades 1-4 -- 680.

 from Brown attendance area
 all students in grades 1-4 -- <u>222</u>
 902 (24% Negro)

Clemmons Elementary School -- Capacity-890

 from Clemmons attendance area
 all students in grades 1-4 -- 657

 from Brown attendance area
 students in grades 1-4 -- <u>220</u>
 877 (25% Negro)

Brown Elementary School -- Capacity-830.

 from Brown attendance area
 all students in grades 5-6 -- 221

 from Griffith attendance area
 all students in grades 5-6 -- 340

 from Clemmons attendance area
 all students in grades 5-6 -- <u>329</u>
 890 (24% Negro)

<u>Group #7</u>

Lewisville Elementary School -- Capacity-726

 from Lewisville attendance area
 all students in grades 1-4 -- 420.

 from Fourteenth St. attendance area
 students from grades 1-4 -- <u>200</u>
 620 (32% Negro)

[A2714]

## Table 4 (Cont.)

### "Inner City/Outer Rim" Groupings

Group #7

Vienna Elementary School -- Capacity-595

from Vienna attendance area
all students in grades 1-4 -- 290

from Fourteenth St. attendance
area students in grades 1-4 -- 150
 440 (34% Negro)

Fourteenth St. Elementary School -- Capacity-1046

from Fourteenth St. attendance
area all students in grades 5-6 -- 228

from Lewisville attendance area
all students in grades 5-6 -- 211

from Vienna attendance area
all students in grades 5-6 -- 145
 584 (38% Negro)

Group #8

Konnoak Elementary School -- Capacity-577

from Konnoak attendance area
all students in grades 1-3 -- 275

from Easton attendance area
all students in grades 1-3 -- 168
 443

Easton Elementary School -- Capacity-456

from Easton attendance area
all students in grades 4-6 --168

from Konnoak attendance area
all students in grades 4-6 ---

[A2715]

*Implications of Inner City/Outer Rim Groupings*

A study of the approach to desegregation involved in grouping inner city schools with outer rim schools yields several implications which deserve comment.

1. The approach results in full desegregation of twenty elementary schools.

2. The approach transforms the seven racially isolated black elementary schools of the inner city into desegregated schools serving grades 5–6.

3. All twenty schools will be majority white—minority black in close proximity to the racial composition of elementary education generally in the district.

4. Students presently residing in the attendance areas of the thirteen outer rims schools will be attending their own area school for grades one through four.

5. Students presently residing in the attendance areas served by the

seven inner city schools will have to be transported to outer rim schools for the first four grades.

6. The plan utilizes present buildings in the inner city and outer rim; its implementation need not be delayed by construction schedules. In a few cases the students assigned exceed building capacity. This can be remedied through adjustments in assignment or through use of relocatables.

7. The transportation envisioned in the plan will be on a building to building "express" basis and in no case is excessive in time or mileage. Table 5 outlines the approximate numbers of students who will have to be transported from the inner city to the outer rim for grades 1-4 and from the outer rim to the inner city for grades 5-6.

8. It will be possible to stagger school opening schedules in such a way as to enable busses to make round trips from inner city schools to the outer rim schools and vice-versa. Each bus will then be fully utilized.

9. It is suggested that busses be stored at the outer rim schools where there is ample room on each site.

## Table 5

## Pupil Transportation--Inner City/Outer Rim Plan

| From | To | Number | |
|------|-----|--------|---|
| Mebane (1-4) | Waughtown | 120 | |
| " " | Union Cross | 212 | Group #1 |
| Waughtown (5-6) | Mebane | 120 | |
| Union Cross " | Mebane | 221 | |
| | | 673 | |
| | | | |
| Skyland (1-4) | Sedge Gardens | 200 | |
| " | Kernersville | 120 | Group #2 |
| Kernersville (5-6) | Skyland | 192 | |
| Sedge Gardens " | Skyland | 314 | |
| | | 826 | |
| | | | |
| Fairview (1-4) | Walkertown | 300 | |
| " " | Kernersville | 162 | Group #3 |
| Walkertown (5-6) | Fairview | 336 | |
| Kernersville (5-6) | Fairview | 192 | |
| | | 990 | |
| | | | |
| Carver Crest (1-4) | Rural Hall | 200 | |
| " " " | Oak Summit | 118 | Group #4 |
| Rural Hall (5-6) | Carver Crest | 307 | |
| Oak Summit (5-6) | Carver Crest | 229 | |
| | | 854 | |
| | | | |
| North El. (1-4) | South Fork | 260 | |
| " " " | Bolton | 200 | Group #5 |
| South Fork (5-6) | North El. | 231 | |
| Bolton (5-6) | North El. | 174 | |
| | | 865 | |

Table 5—Cont'd.

## Pupil Transportation--Inner City/Outer Rim Plan

| From | To | Number | |
|------|-----|--------|---|
| Brown (1-4) | Griffith | 222 | |
| " " | Clemmons | 220 | Group #6 |
| Griffith (5-6) | Brown | 340 | |
| Clemmons (5-6) | Brown | 329 | |
| | | 1111 | |
| | | | |
| Fourteenth St. (1-4) | Lewisville | 200 | |
| " " " | Vienna | 150 | Group #7 |
| Lewisville (5-6) | Fourteenth St. | 211 | |
| Vienna (5-6) | Fourteenth St. | 145 | |
| | | 706 | |

[A 2684]

**Total** . 6025

*"Middle-Rim" School Desegregation*

Table 2 lists the "Middle-Rim" schools. Two of the schools, Diggs and Kimberly Park, are exclusively Negro in population. Carver Elementary School presently houses a completely Negro population; 350 of its students will be retained in "Middle-Rim" schools when Carver Elementary is closed and that portion of its students reassigned to Ibraham and Petree as recommended. One school, Lowrance, has a student population that is predominantly Negro with a token few white students. Brunson and Petree are presently desegregated schools according to our formula. Ten schools are presently predominantly to exclusively white schools. The total student population in "Middle-Rim" attendance areas is 9816. Of this total, 2743 or 27.9% are Negro. Desegregated schools in the "Middle-Rim" should each house a student population that is 18% to 38% Negro.

The plan for desegregation of the "Middle-Rim" schools is presented below. It will be noted that all the schools can be desegregated by redrawing attendance area lines as indicated, Group A incorporating the present Ibraham, Mineral Springs and Petree attendance areas; Group B incorporating the present Diggs, Latham, Forest Park, South Park, and Ardmore attendance areas; Group C incorporating the present Kimberly Park, Lowrance, Speas, Sherwood Forest, Whitaker, Moore attendance areas; and, finally, Brunson which remains as is. All data are presented in Table 6.

### Table 6

## Proposed Attendance Areas -- Middle-Rim Schools

### Group A

| School | Student Enrollment | | | |
|--------|-------|-------|-------|---|
| | White | Negro | Total | |
| *Ibraham | 361 | 200 | 561 | |
| Mineral Springs | 832 | 48 | 880 | |
| yPetree | 280 | 200 | 480 | |
| | 1473 | 448 | 1921 | (23% Negro). |

Table 6—Cont'd.

Proposed Attendance Areas -- Middle-Rim Schools

Group B

| | | | | |
|---|---|---|---|---|
| Diggs | 0 | 609 | 609 | |
| Latham | 415 | 7 | 422 | |
| Forest Park | 647 | 20 | 667 | |
| South Park | 536 | 4 | 540 | |
| Ardmore | 586 | 7 | 593 | |
| | 2184 | 647 | 2831 | (22% Negro) |

Group C

| | | | | |
|---|---|---|---|---|
| Kimberly Park | 0 | 778 | 778 | |
| Lowrance | 12 | 726 | 738 | |
| Speas | 996 | 2 | 998 | |
| Sherwood Forest | 822 | 1 | 823 | |
| Whitaker | 608 | 7 | 615 | |
| Moore | 438 | 0 | 438 | |
| | 2876 | 1514 | 4390 | (34% Negro) |

Group D

| | | | | |
|---|---|---|---|---|
| Brunson | 540 | 135 | 675 | (20% Negro) |

*Includes 200 from former Carver Elementary Attendance Area.
yIncludes 151 from former Carver Elementary Attendance Area.

[A 2674]

*Implications of "Middle-Rim" Desegregation Plan*

The "Middle-Rim" desegregation plan involves groups of schools. Within each group the schools are contiguous to each other. Each school within each group will house grades 1–6. Pupil assignment to the school of the group will be by his nearness to the school and by the desired racial composition for that school. Therefore all attendance area lines formerly separating the schools within the group from each other have been abolished. In effect, then, each group becomes a single attendance area. There are four attendance areas in the middle-rim—the northern attendance area incorporating Ibraham, Mineral Springs and Petree; the western attendance area incorporating Kimberly Park, Lowrance, Speas, Sherwood Forest, Whitaker and Moore; the southern attendance area incorporating Diggs, Latham, Forest Park, South Park, and Ardmore; and the Brunson attendance area.

Through the use of pupil-locator maps it will be possible to assign students to schools within each attendance area in such a way that transportation is minimal and each school reflects within ten percentage points the racial composition for that attendance area. For many pupils in the middle-rim this will mean "walk-in" schools. A certain amount of pupil transportation will have

to be furnished for those pupils who must be assigned to schools beyond walking distance. Without pupil "pin" maps I can not say how many this will be.

## Part II

### Secondary School Desegregation

All junior high schools in the district will be totally desegregated by drawing new attendance area boundaries for each junior high school. Within each new junior high attendance area, then, will be the attendance areas of the feeding elementary schools to that junior high. This means that the population of each junior high school in the district can be reconstituted at the beginning of school in September of 1970.

All senior high schools in the district will be totally desegregated by drawing new attendance area boundaries for each senior high school. Within each senior high attendance area, then, will be the attendance areas of the junior high schools feeding that senior high school. This can be done in September also.

In a few instances it will be necessary to split feeder elementary schools and feeder junior high schools in order to assure near optimum capacity in each junior and senior high school. When such splitting of incoming feeder groups has been necessary, it is so indicated. It is suggested that the splitting of feeder groups be done by geography of home location. For instance when an elementary group needs to be split among two junior high schools, the portion of the group nearest that junior high school by residence should be assigned there.

An effort has been made in this plan to adhere as closely as possible to the practice of assigning students to secondary attendance areas in as equitable way as possible so that transportation is minimized.

### Table 7

#### Feeder Systems -- Elementary-Secondary

East Senior High School (Capacity--1392)

Glenn Jr. High

Group #1 (762)

Walkertown Jr. High

Group #3 (in part-700)

Atkins Senior High School (Capacity -- 1372)

Kennedy Jr. High

Group #2 (1003)

Kernersville Jr. High

Group #3 (in part-400)

Parkland Senior High School (Capacity 1624)

Griffith Jr. High

Group #6 (in part-700)

Philo Jr. High

Group #8 (444)

Hill Jr. High

Group B (in part-800)

[A 2675]

Table 7—Cont'd.

Feeder Systems -- Elementary-Secondary

Carver Senior High School (Capacity 900plus)

Hanes Jr. High Anderson Jr. High

Group C (in part-600) Group B (in part-600)

North Senior High School (Capacity 1914)

Northwest Jr. High Mineral Springs Jr. High

Group #4 (1042) Group A (960)

Old Town/Old Richmond (409)

Mt. Tabor Senior High School (Capacity 928)

Jefferson Jr. High

Group C (in part-730)

Reynolds Senior High School (Capacity-2294)

Wiley Jr. High Paisley Jr. High Dalton Jr. High (in part)

Group D (337) Group C (in part-950) Group #5 (in part-307)

[A 2676]

West Senior High School (Capacity 1189)

Southwest Jr. High Dalton Jr. High (in part)

Group #7 Group #6 (in part-589)

[A 2677]

*Implications of Secondary School Desegregation*

Because the secondary school attendance areas and feeder patterns are built on the base of desegregated elementary schools, the secondary schools become desegregated institutions as well. An effort has been made to achieve near-optimum size in each secondary school. In a few cases where the estimated influx may exceed capacity adjustments in assignments or use of relocatables will have to be considered. Once the attendance area lines are drawn incorporating the elementary zones there is no reason that the secondary schools could not be reconstituted in the form of student population by September of 1970. Virtually all present secondary buildings are utilized with the following exceptions:

1. Carver becomes only a senior high school. The elementary and junior high components will have been removed from the building.

2. Anderson becomes a junior high school only.

*Group C Schools*

This group of six schools constitutes a different situation than the other schools in the "Middle Rim". Because of my intention of retaining Brunson as a desegregated school with its present attendance area, Kimberly Park and Lowrance become physically separated from the four predominantly white schools of Group C. It is suggested, therefore, that the Group C schools be paired in the same manner as the school combinations in the "Inner-City/Outer Rim" groupings. Table 6a presents the enrollment and assignment data for this grouping.

Table 6a
Group C Combinations

Group C1 *Speas Elementary School -- Capacity-755

from the Speas attendance area
all students in grades 1-4 -- 665

From the Lowrance attendance area
students in grades 1-4 -- 220
 885 (25% Negro)

ySherwood Forest Elementary School -- Capacity-720

from the Sherwood Forest attendance area
all students in grades 1-4 -- 548

from the Lowrance attendance area
students in grades 1-4 -- 272
 820 (33% Negro)

‡Lowrance Elementary School -- Capacity 696

from Lowrance attendance area
all students in grades 5-6 -- 246

from Speas attendance area
all students in grades 5-6 -- 333

from Sherwood Forest Attendance area

all students in grades 5-6 -- 275
 854 (28% Negro)

*Speas is presently (1969-1970) listed as 243 over capacity.

ySherwood Forest is presently (1969-1970) listed as 103 over capacity.

‡Lowrance is presently (1969-1970) listed as 42 over capacity.

[A2716]

Table 6a (cont.)

Group C Combinations

Group C2

Moore Elementary School -- Capacity-746

 from Moore attendance area
 all students in grades 1-4 -- 292

 from Kimberly Park attendance
 attendance area students 1-4 200
 492 (40% Negro)

Whitaker Elementary School -- Capacity-708

 from Whitaker attendance area

 all students in grades 1-4 410

 from K. Park attendance area
 students in grades 1-4 318
 728 (43% Negro)

Kimberly Park Elementary School -- capacity-720

 from K. Park attendance area
 all students in grades 5-6 -- 260

 from Moore attendance area
 all students in grades 5-6 -- 146

 from Whitaker attendance area
 all students in grades 5-6 -- 205
 611 (42% Negro)

[A2719]

---

## APPENDIX B

MODIFICATION OF PUPIL ASSIGNMENT PLAN OF THE WINSTON-SALEM/FORSYTH. COUNTY UNITARY SCHOOL SYSTEM, ADOPTED BY THE WINSTON-SALEM/FORSYTH COUNTY BOARD OF EDUCATION, TO BE EFFECTIVE FOR THE 1970–71 SCHOOL YEAR

### CONTENTS

Modification of Pupil Assignment Plan

Feeder Plan

Enrollment Estimates

Description of Attendance Areas

Appendix A—Notice of School Desegregation Plan

Appendix B—Brief Summary of Present Operation

Appendix C—Present Remedial Programs

## WINSTON-SALEM/FORSYTH COUNTY SCHOOLS

Modification of
Pupil Assignment Plan
1970–1971

The Winston-Salem/Forsyth County Board of Education has taken the following action which results in modification of its pupil assignment plan effective with the 1970–1971 school year:

I. Free Choice of Transfer Amendments

To encourage exercise of the transfer privilege to promote further integration throughout the school system the existing transfer provisions (see paragraphs 3 and 4 of Appendix A, attached) are amended:

a. To give priority to requests for transfer from a school in which the pupil's race (in the school to which the pupil is initially assign-

ed) is in the majority to a school in which the pupil's race is in the minority (majority to minority requests).

b. To grant majority to minority requests even though they result in overcrowding, up to 10% above the normal rated capacity of the school.

c. To make available free school bus transportation for pupils who make majority to minority transfers if they live one and one-half miles or more from the school to which they transfer.

As amended, the transfer provisions (paragraphs 3 and 4 of Appendix A) will read as follows:

3. Transfer to School in Another Zone

A pupil may transfer from the school to which he is assigned only under the following conditions:

The parent, guardian, or other adult person acting as a parent, of any pupil who has been assigned in accordance with the provision of paragraph 2, above, may apply to the Board for reassignment of such pupil for the ensuing school year to any school serving the pupil's grade and located in any other attendance zone. Such application for reassignment shall be in writing on forms which will be freely provided in the offices of all principals and the superintendent for that purpose. All applications received on or before June 1 will be approved on the following basis:

a. Majority to minority requests (i. e., where the pupil is requesting transfer from a school in which his race is in the majority to a school in which his race is in the minority) will be given first priority, and will be approved even though the granting of the request will result in overcrowding, up to 10% above the normal rated capacity of the school to which transfer is being made. This will apply to as many alternate choices as the applicant designates, where his first choice cannot be approved due to exces-

sive overcrowding. Free school bus transportation will be made available for pupils who make majority to minority transfers, who reside one and one-half miles or more from the school to which they transfer and whose applications are received by June 1.

b. After giving priority to majority to minority requests as above provided, all other applications received on or before June 1 will be approved up to but not in excess of the normal rated capacity of the school to which transfer is requested, and no special transportation will be provided in such cases.

c. Where some but not all applications received on or before June 1 cannot be approved because of overcrowding, priority (under a. or b. above) shall be given on the basis of proximity of the school to the homes of the pupils.

Applications may be made after June 1, to and including August 28, but applications made during that period will be approved in order of receipt up to, but not in excess of the normal rated capacity of the school, without regard to race, color or national origin, and without special transportation being provided.

School capacity standards shall be applied uniformly throughout the schools of the system.

4. Notification of Assignment

On or before May 1, the parent or other adult person acting as parent, of each pupil enrolled in this system will be sent a letter telling him the name of the school to which the pupil will be assigned for the coming year. A copy of this notice will be enclosed with each letter. The letter will direct attention to the provision of paragraph 3 of this notice relating to transfer to a school in another zone and the provision of school bus transportation in the case of majority to minority transfers. The letter will also give information on any school bus service provided for the pupil's neighborhood. There will also be enclosed with the

letter a list of all schools in the system, showing those which are overcrowded and whether or not overcrowded in excess of 10% of normal rated capacity. The same letter and notice will be sent on the same date for all school children the school system expects to enter the school system for the first time at the beginnning of the next school year. This includes children entering the first grade. If the school system learns of a new pupil after the letter is sent out it will promptly send the pupil's parent such a letter and a copy of this notice.

## II. Attendance Area Revisions

1. *Anderson Area*

Convert Anderson Jr.-Sr. High to a junior high school and reassign the senior high students to Parkland.

Enrollment at Anderson Jr. High is approximately 540 and is sufficient to operate an effective program. The senior high enrollment of slightly more than 400 is too small to provide a broad and comprehensive instructional program. Reassignment of the senior high pupils to Parkland will give these 400 students access to a comprehensive senior high school instructional program and will achieve a substantial racial mix at Parkland. It will also ease the crowded situation at Anderson and enable the junior high program to make full utilization of the Anderson building and its instructional facilities.

2. *Carver—Ibraham—Petree Area*

a. Reassign Carver Elementary students living north of the school to Ibraham Elementary School.

b. Draw definite attendance area lines separating the Ibraham Elementary School attendance area from the Mineral Springs and Oak Summit attendance areas.

c. Reassign Carver Elementary students living south of the school to Petree Elementary School.

d. Draw definite attendance area lines separating the Petree Elementary School attendance area

from the Walkertown Elementary School attendance area.

e. Reassign Carver Senior High students living north of the school to North Forsyth and those living south of the school to East Forsyth.

f. Convert Carver into an area junior high school to be fed by the newly enlarged Ibraham and Petree Elementary attendance areas.

g. Retain the ESEA Title I Pre-School Program in the Carver building.

Both the junior and senior high school programs at Carver are handicapped due to the small enrollments, about 256 in the junior high school and about 212 in the senior high school.

These changes result in the elimination of Carver Elementary and Senior High attendance areas and enlarge the Carver Junior High attendance area. Every student in the Carver area will be assigned to an integrated school and the Carver building and its instructional facilities will be well utilized.

3. *Mineral Springs—Lowrance Area*

a. Reassign students living in the northeastern corner of the Lowrance Elementary attendance area to Mineral Springs Elementary.

b. Draw definite attendance area lines between the two elementary schools which serve the Mineral Springs Junior High School—Mineral Springs Elementary and Oak Summit.

These changes will relieve overcrowding at Lowrance and Mineral Springs and provide fuller utilization of the Oak Summit building. At the same time, it provides for increased integration at Mineral Springs Elementary and Oak Summit Elementary.

In making the changes described above, the Board of Education recognizes the fact that substantial crowding results at East Forsyth and Parkland. The Board plans to move ahead immediately with detailed planning for con-

struction of senior high schools in the northeast and in the southeast to ade- quately serve the total senior high school population of Forsyth County.

### WINSTON-SALEM/FORSYTH COUNTY
### SCHOOLS
### 1970 -1971

| ATKINS | EAST FORSYTH | MOUNT TABOR |
|---|---|---|
| Hanes Jr.* | Glenn Jr. | Jefferson Jr. |
| North El. | Sedge Garden | Old Town* |
| | Union Cross | Sherwood Forest |
| Kennedy Jr. | | Speas |
| | Kernersville Jr. | |
| Brown | | |
| Fairview | Kernersville El. | |
| Fourteenth St. | | |
| Skyland | Walkertown Jr. | |
| | | |
| | Walkertown El. | |
| | | |
| | Carver Jr.* | |
| | | |
| | Petree | |

| NORTH FORSYTH | PARKLAND | REYNOLDS | WEST FORSYTH |
|---|---|---|---|
| Hanes Jr.* | Griffith Jr. | Children's Home Jr. | Southwest Jr. |
| Lowrance | Griffith El. | Children's Home El. | Clemmons |
| | | | Lewisville |
| Mineral Springs Jr. | Hill Jr. | Dalton Jr. | South Fork |
| | | | Vienna |
| Mineral Springs El. | Easton | Ardmore | |
| Oak Summit | Forest Park | Bolton | |
| | Waughtown | Latham* | |
| Northwest Jr. | | Moore | |
| | Philo Jr. | | |
| Old Richmond | Latham* | Paisley Jr. | |
| Old Town* | Konnoak | Carver Crest | |
| Rural Hall | South Park | Kimberley Park* | |
| Paisley Jr.* | Anderson Jr. | Wiley Jr. | |
| Kimberley Park* | Diggs | Brunson | |
| | Mebane | Latham* | |
| Carver Jr.* | | Whitaker | |
| Ibraham | | | |

Winston-Salem/Forsyth County Schools

### ENROLLMENT ESTIMATES
(1969-70 membership figures have been used and adjusted for changes in the Feeder Plan )

| ELEMENTARY SCHOOLS | ESTIMATED ENROLLMENT | | |
|---|---|---|---|
| | Black | White | Total |
| Ardmore | 7 | 588 | 595 |
| Bolton | 0 | 521 | 521 |

*Feeds into more than one school

[A 2678]

Winston-Salem/Forsyth County Schools—Cont'd.
## ENROLLMENT ESTIMATES

(1969-70 membership figures have been used and adjusted for changes in the Feeder Plan )

| ELEMENTARY SCHOOLS | ESTIMATED ENROLLMENT | | |
|---|---|---|---|
| | Black | White | Total |
| Brown | 663 | 0 | 663 |
| Brunson | 135 | 545 | 680 |
| Children's Center | 4 | 45 | 49 |
| Children's Home | 0 | 174 | 174 |
| Clemmons | 14 | 973 | 987 |
| Cook | 477 | 0 | 477 |
| Diggs | 0 | 609 | 609 |
| Easton | 146 | 191 | 337 |
| Fairview | 693 | 0 | 693 |
| Forest Park | 20 | 657 | 677 |
| Fourteenth Street | 592 | 0 | 592 |
| Griffith | 0 | 1020 | 1020 |
| Ibraham | 235 | 361 | 596 |
| Kernersville | 36 | 1116 | 1152 |
| Kimberley Park | 778 | 0 | 778 |
| Konnoak | 1 | 550 | 551 |
| Latham | 3 | 423 | 426 |
| Lewisville | 29 | 602 | 631 |
| Lowrance | 558 | 11 | 569 |
| Mebane | 504 | 0 | 504 |
| Mineral Springs | 175 | 706 | 881 |
| Moore | 0 | 439 | 439 |
| North Elementary | 689 | 0 | 689 |
| Oak Summit | 95 | 700 | 795 |
| Old Richmond | 41 | 309 | 350 |
| Old Town | 99 | 1189 | 1288 |
| Petree | 146 | 319 | 465 |
| Rural Hall | 50 | 870 | 920 |
| Sedge Garden | 7 | 939 | 946 |
| Sherwood Forest | 1 | 821 | 822 |
| Skyland | 573 | 0 | 573 |
| South Fork | 0 | 693 | 693 |
| South Park | 4 | 533 | 537 |
| Speas | 2 | 996 | 998 |
| Union Cross | 3 | 653 | 656 |
| Vienna | 12 | 423 | 435 |
| Walkertown | 91 | 917 | 1008 |
| Waughtown | 0 | 359 | 359 |
| Whitaker | 7 | 608 | 615 |

| JUNIOR HIGH SCHOOLS | ESTIMATED ENROLLMENT | | |
|---|---|---|---|
| | Black | White | Total |
| Anderson | 541 | 0 | 541 |
| Carver | 190 | 340 | 530 |
| Dalton | 1 | 826 | 827 |
| Glenn | 2 | 764 | 766 |
| Griffith | 0 | 521 | 521 |

Winston-Salem/Forsyth County Schools—Cont'd

## ENROLLMENT ESTIMATES

*(1969-70 membership figures have been used and adjusted for changes in the Feeder Plan )*

| JUNIOR HIGH SCHOOLS | ESTIMATED ENROLLMENT | | |
|---|---|---|---|
| | Black | White | Total |
| Hanes | 423 | 13 | 436 |
| Hill | 41 | 537 | 578 |
| Jefferson | 1 | 815 | 816 |
| Kennedy | 1043 | 0 | 1043 |
| Kernersville | 24 | 495 | 519 |
| Mineral Springs | 127 | 678 | 805 |
| Northwest | 107 | 960 | 1067 |
| Paisley | 558 | 0 | 558 |
| Philo | 19 | 638 | 657 |
| Southwest | 19 | 1244 | 1263 |
| Walkertown | 46 | 433 | 479 |
| Wiley | 183 | 628 | 811 |
| **SENIOR HIGH SCHOOLS** | | | |
| Atkins | 1125 | 0 | 1125 |
| East | 112 | 1474 | 1586 |
| * Mt. Tabor | 1 | 1217 | 1218 |
| North | 405 | 1461 | 1866 |
| Parkland | 497 | 1453 | 1950 |
| Reynolds | 257 | 1456 | 1713 |
| West | 23 | 1057 | 1080 |
| Continuing Education | 60 | 9 | 69 |
| Central | 186 | 164 | 350 |

**\*Grades 9 - 12**

[A 2680]

## DESCRIPTION OF ATTENDANCE AREAS

All school districts remain as they existed in 1969–1970 except for the changes described as follows:

I. East Forsyth Attendance Area

 A. East Forsyth Senior High School

 East Forsyth has been altered by the addition of the southern portion of the Carver Senior High Attendance Area as described in the Petree Attendance Area.

 B. Carver Junior High

The Carver Junior High district will be composed of students living in the Petree and Prince Ibraham Attendance Areas.

C. The description of Carver Junior High School feeder elementary schools follows:

1. Petree Elementary School
 Beginning at a point east of the airport runway where the present northeast corner of Lowrance is located; running eastward through the Carver School to the present eastern Carver district line; continuing northeasterly to the intersection of Belews Creek Road and Williston

Road; continuing southeasterly to the intersection of U. S. Route 421 and the Kernersville Elementary at the most westerly point.

The southern boundary shall remain the same.

The northern portion of the western boundary shall be same as the northeastern portion of the Skyland district. The southern portion of the Petree western district shall remain the same.

2. * Ibraham Elementary School
The southern boundary begins at a point east of the airport runway where the present northeast corner of Lowrance is located; running eastward through the Carver School to the eastern Carver district line; running northward along the present Carver eastern boundary; continuing northerly along the western Walkertown Elem. district to a point directly east of the northern termination of Davis Road; running west to an imaginary point in line with a straight line running from the northwest corner of the present Carver district through the intersection of Carlton Road and White Rock Road; running south from the northwest corner of the present Carver district to the point of origin.

D. Glenn Junior High School—No change

E. No change in the following Elementary Attendance Areas:
 1. Sedge Garden
 2. Union Cross

F. Kernersville Junior High School —No change

G. Kernersville Elementary School —No change

H. Walkertown Junior High School
Walkertown Junior High School has been altered by the reas-signment of the Petree Elementary Attendance Area to the Carver Junior High School Attendance Area

I. Walkertown Elementary School
The only change is that the southern boundary of the Walkertown district has been established as described in the Petree district.

II. Anderson Senior High Attendance Area
Anderson Senior High School students are reassigned to Parkland Senior High School.

III. Carver Attendance Area
 A. Carver Senior High School
 Students reassigned to East and North Forsyth Senior High Schools

 B. Carver is retained as a Junior High School fed by Petree and Prince Ibraham Elementary Schools.

 C. Carver Elementary School
 Students north of the Carver building assigned to Prince Ibraham and students south of the Carver building assigned to Petree Elementary School.

IV. North Forsyth Attendance Area
 A. North Forsyth Senior High School Attendance Area has been altered by the addition of that portion of the Carver District as described in the Prince Ibraham District (see East Forsyth Attendance Area)

 B. Hanes Junior High School
 Hanes Junior High School Attendance Area has been altered by the deletion of a portion of the Lowrance district.

 C. Lowrance Elementary School
 District remains the same except that the following portion has been taken out and added to Mineral Springs Elementary School: Piedmont Park and Brookwood

---

* Feeds from Carver Jr. High School to North Forsyth High.

Development east of Highway 52 North.

The area bounded by:
South—26th Street (to include 26th St.)
East—Rochester Street (to include Rochester St.)
North—Smith Reynolds Airport
West—Highway 52 North

D. North Elementary School—No change—continues to feed Atkins

E. Mineral Springs Junior High

Mineral Springs Junior High has been altered by the deletion of the Prince Ibraham Elementary School and the addition of a small section of the Hanes district (see IV–C)

F. Mineral Springs Elementary School

The Mineral Springs district has been altered as follows:

Begin at intersection of Cherry Street and # 8. Proceed south on Cherry to intersection of Cherry Street and 33rd Street. East along 33rd Street to new # 52. Southerly along new # 52 to 26th Street. East along 26th St. (including 26th St.) to Rochester St. North along Rochester St. (including Rochester St.) to Smith Reynolds Airport and then to Prince Ibraham—Carver Line. North along Prince Ibraham Line to intersection of Oak Summit—Prince Ibraham Line. Line proceeds westerly coterminus with the Oak Summit line to point of beginning.

G. Oak Summit Elementary School

The Oak Summit Elementary School District has been defined as follows:

Begin at intersection of Old Rural Hall Road and Baux Mountain Road, proceed east to Prince Ibraham line. North along Prince Ibraham line to Walkertown Elementary line to Stokes County line. West along Stokes County line to point 200 feet west of Red Bank Road. South along Red Bank Road 200 feet west to Memorial Industrial School Road. Then southwest on a straight line to a point on Shiloh Church Road one mile and one-half east of Germanton Road. Then a line south to a point 200 feet west of Merrydale and # 66. Then south to a point 200 feet west of Karen Circle. Then northwest to a point 200 feet north of Club Knoll Road. Then southwest to the intersection of Whittier Road and # 8. Then west to intersection of County Farm Road and # 52. Then south 200 feet west of Cherry Street to intersection of Cherry Street and # 8. Then northeast until line intersects new # 52. Then a straight line easterly that proceeds 200 feet north of Voss Street to a point 200 feet east of Old Rural Hall Road. Then south along Old Rural Hall Road 200 feet east to point of beginning.

H. There are no other changes in the North Forsyth Attendance Area.

V. Parkland Attendance Area

A. Parkland Senior High School

The Parkland Attendance Area has been altered by the addition of the Anderson Junior High School Attendance Area.

B. Anderson Junior High School

1. Anderson Junior High School feeds Parkland Senior High School. There is no change in the Anderson Junior High School Attendance Area.

2. Anderson Junior High is fed by Diggs and Mebane Elementary Schools. There are no changes in the attendance areas of these elementary schools

C. There are no other changes in the Parkland Senior High Attendance Area.

## APPENDIX A

### WINSTON-SALEM/FORSYTH COUNTY SCHOOLS

Winston-Salem, North Carolina 27102

Granville Drive at Academy Street

Post Office Box 2513

### NOTICE OF SCHOOL DESEGREGATION PLAN UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

THIS NOTICE IS MADE AVAILABLE TO INFORM YOU ABOUT THE DESEGREGATION OF OUR SCHOOLS. KEEP A COPY OF THIS NOTICE. IT WILL ANSWER MANY QUESTIONS ABOUT SCHOOL DESEGREGATION.

### 1. Desegregation Plan in Effect

The Winston-Salem/Forsyth County public school system is being desegregated under a plan adopted in accordance with Title VI of the Civil Rights Act of 1964. The purpose of the desegregation plan is to eliminate from our school system the racial segregation of students and all other forms of discrimination based on race, color, or national origin. Your school board and the school staff will do everything they can to see to it that the rights of all students are protected and that our desegregation plan is carried out successfully.

### 2. Non-Racial Attendance Zones

Under the desegregation plan, the school each student will attend depends on where he lives. An attendance zone has been established for each school in the system. All students in the same grade who live in the same zone will be assigned to the same school, regardless of their race, color, or national origin and regardless of which school they attend now; (*except that any student now attending a school outside the attendance zone of his residence, as a result of his free choice, will be assigned to that school for the ensuing school year if it offers his grade. He may transfer to another school under the provisions of Paragraph 3*).

### 3. Transfer to School in Another Zone

A student may transfer from the school to which he is assigned only under the following conditions:

### ADDENDUM TO ASSURANCE OF COMPLIANCE (FORM HEW 441–B (3–66) OF THE WINSTON-SALEM/FORSYTH COUNTY BOARD OF EDUCATION DATED THE Fifth DAY of April, 1966

The parent, guardian, or other adult person acting as a parent, of any pupil who has been assigned in accordance with the provision of paragraph 2, above, may apply to the Board for reassignment of such pupil for the ensuing school year to any school serving the pupil's grade and located in any other attendance zone. Such application for reassignment shall be in writing, on forms which will be freely provided in the offices of all principals and the superintendent for that purpose. Transfers shall be allowed, without regard to race, color or national origin, and shall be denied for no reason other than overcrowding. If the chosen school is overcrowded, the pupil will be notified promptly, in writing, and will be given his choice of all other schools in the system serving his grade where space is available. Application for such assignment shall be made on or before August 29. All applications received on or before June 23 will be approved on that date, up to the pupil capacity of the school, priority being given, in the event of overcrowding, on the basis of proximity of the school to the homes of the students. Applications made after June 23 and on or before August 29 will be approved in order of receipt until the capacity of the building is reached.

In any case where a transfer application is to be denied because of overcrowding, or lack of available space, or inadequate pupil capacity of a school building, standards for such conditions shall be applied uniformly throughout the schools of the system.

### 4. Notification of Assignment

On May 23, 1969, the parent, or other adult person acting as parent, of each

student enrolled in this system will be sent a letter telling him the name of the school to which the student will be assigned for the coming school year. The letter will also give information on any school bus service provided for the student's neighborhood. A copy of this notice will be enclosed with each letter. The same letter and notice will be sent out on the above date for all children the school system expects to enter the school system for the first time next year. This includes children entering first grade. If the school system learns of a new student after the letter is sent out, it will promptly send the student's parent such a letter and a copy of this notice.

5. Maps Showing Attendance Zones

Maps showing the boundary lines of the attendance zones of every school in the school system are freely available for inspection by the public at the superintendent's office. Individual zone maps are available at each school.

6. Revision of Attendance Zones Boundaries

Any revision of attendance zone boundaries will be announced by a prominent notice in a local paper at least 30 days before the change is effective.

7. All Other Aspects of Schools Desegregated

All school-connected services, facilities, athletics, activities and programs are open to each student on a desegregated basis. A student assigned to a new school under the provisions of the desegregation plan will not be subject to any disqualification or waiting period for participation in activities and programs, including athletics, which might otherwise apply because he is a transfer student. All transportation furnished by the school system will operate on a desegregated basis. Faculties will be desegregated, and no staff member will lose his position because of race, color, or national origin. This includes any case where less staff is needed because schools are closed or enrollment is reduced.

8. Attendance Across School System Lines

No arrangement will be made or permission granted by this school system for any students living in the community it serves to attend school in another school system, where this would tend to limit desegregation, or where the opportunity is not available to all students without regard to race, color, or national origin. No arrangement will be made or permission granted, by this school system, for any students living in another school system to attend public school in this system, where this would tend to limit desegregation, or where the opportunity is not available to all students without regard to race, color, or national origin.

9. Complaints

Under the desegregation plan, school officials seek the support of all parts of the community for the desegregation of its schools. It is contrary to the plan for school officials and teachers to dissuade persons from attending a school where a desegregated education can be obtained, or to frustrate the purpose of the plan with promises of favors or threats of penalties. In addition, it is contrary to Federal requirements for any other person to use intimidation or retaliation in order to interfere with the rights of students and parents under the plan. Any person who has a complaint about the operation of the desegregation plan should bring the matter to the attention of the responsible local or state officials. If they do not correct the matter promptly, any person familiar with the facts should report them without delay to the Office for Civil Rights, Department of Health, Education, and Welfare, Washington, D. C. 20202 (telephone 202–962–0333). The name of any person submitting a complaint to the Office for Civil Rights will not be disclosed if he so requests.

## APPENDIX B

### BRIEF SUMMARY
### OF
### PRESENT OPERATION
### WINSTON-SALEM/FORSYTH COUNTY SCHOOL SYSTEM

1. *Faculties*

 The ratio of black and white faculty assigned to each school is approximately the same as the ratio of black and white teachers currently employed throughout the system, except for certain specialized faculty positions. The competence of the faculty at each grade level in every school is relatively the same.

 Faculty salaries are established on a standard non-discriminatory basis. No differences exist on account of race.

2. *Curriculum and Materials*

 The curriculum in each school and for each grade level is relatively the same except variations exist at the secondary level because of interest and demand. Any variations existing on the secondary level are not attributable to race. Library books and instructional materials and equipment are relatively equal at each school and each grade level. Any differences are due to factors other than race.

3. *Facilities*

 School facilities are relatively equal at each grade level. Where differences exist, it is due to school organization, age of certain buildings, age of pupils, grade organizations and instructional programs. Differences existing are due to factors other than race.

4. *Pupil-Teacher Ratio*

 The pupil-teacher ratio is approximately the same for each school at the same grade level in the district. Differences which may exist are due to factors other than race.

5. *Annual Per Pupil Expenditure*

 pils.
 programs are provided for these pu-
 per pupil. A number of remedial
 than the average annual expenditure
 both black and white, receive more
 that certain disadvantaged pupils,
 are approximately the same except
 each school of the same grade level
 The annual per pupil expenditures at

6. *Services, Facilities, Activities and Programs*

 There is no discrimination in services, facilities, activities and programs, including interscholastic athletics or other interscholastic programs. All extracurricular activities are open and available at each school level without regard to race.

7. *Special Programs*

 Programs for the gifted and the mentally and physically handicapped children are conducted without regard to race and are integrated.

8. *Transportation and Bus Routes*

 Transportation is provided in accordance with state law. This means that, in general, pupils residing in Winston-Salem, attending schools within the 1957 corporate boundaries, are not provided with transportation, and all other pupils in the county who live more than 1½ miles from school are provided with transportation. There is no racial discrimination in the provision of transportation.

 Bus routes for the transportation of pupils are established without regard to race. Neither dual nor overlapping routes exist for pupils of different races of the same grade level.

9. *Pupil Assignment*

 Pupil assignments are made on the basis of proximity of pupils to schools, capacity of school buildings, and pupil density. Attendance areas are drawn without regard to race. No dual or overlapping boundaries exist in any geographic attendance area.

No person within the school district is effectively excluded from any school because of race or color.

## PRESENT REMEDIAL PROGRAMS

This School System will continue to provide remedial educational programs for the disadvantaged child, both black and white, by way of concentrated educational programs designed specifically to attack this problem.

The Elementary and Secondary Education Act is an act which authorizes special Federal programs which provide financial assistance to local school systems for special programs and services to children who live in areas which fall below the poverty level as prescribed by H.E.W. Only eligible children may be served by this program. To be eligible, a child must live in the area which has a higher concentration of poverty than the average of the entire school district.

The goals and objectives of the programs initiated under the Title I Act are the same as those society holds for education in general. Among these goals are the development of citizenship, economic independence, obtaining of high scholastic achievement, and emotional and psychological maturity.

## SOME OF THE SCHOOLS PARTICIPATING IN TITLE I PROJECTS
## HIGH SCHOOLS

ATKINS. A special assistant principal for instruction has been added to the staff. This position is created in order to provide a person on the faculty in a leadership position who can devote full time and attention to developing and implementing a realistic teaching program for the students who attend that school with accent on corrective methods and curriculum.

## JUNIOR HIGH SCHOOLS

The Junior High Schools are involved in the special remedial program.

## JUNIOR HIGH SCHOOL FORTIFICATION PROGRAM

In this program, there are special resource teachers, four in number, who are assigned to the junior high schools participating in the program, and the primary function of each of these specialists is to serve the teachers and students of the seventh grade. These resource teachers work regularly with seventeen teachers, and indirectly through the teachers they serve a large number of students in the junior high schools which qualify under the Title I. Hanes, Kennedy, Anderson, and Paisley Junior High Schools qualify for this program.

In addition to a full and normal curriculum program at these two junior high schools, each has the following special programs funded under Title I:

1. Seventh Grade—Fortification In Language.
2. Seventh Grade—Fortification In Arts.
3. Seventh Grade—Fortification In Mathematics.
4. Special Junior High Resource Teacher to advise and participate in the development of special courses of curriculum and modernistic and improved approaches to teaching methods to be applied in all areas of the school.

## ELEMENTARY SCHOOLS

| | |
|---|---|
| Brown | Kimberley Park |
| Children's Home | Lowrance |
| Diggs | Mebane |
| Easton | North Elementary |
| Fairview | Skyland |
| Fourteenth Street | |

All of the below described programs are concentrated in the above named schools.

## PROJECT READ

Project Read is a special individualized reading program for children in grades one through six. In this program, children are provided with specialized materials which are designed to help them learn to read at their own pace and to, in general, considerably improve their reading habits and abilities to the extent that each student shall obtain and exceed

the norm of the average school child throughout the district. During the school day, the children participating in this program have received special reading instructions each day and the regular teacher is assisted by a teacher aide, who works with the teacher and her class for one and a half to two hours daily.

### SPECIAL FIRST GRADE PROGRAM OR OPEN HIGHWAYS PROGRAM

This program has been called the Open Highways Program, simply because the series of the reading books which are used in these classes is known as the "Open Highways Series." It is, in fact, a special program of instruction which attempts to use appropriate materials designed to improve the reading skills of the children participating in these programs. In the schools involved, only children in the first grade are participating. The program also attempts to improve the language skills of each student and to bring their reading levels up to and above local norm for the district in general and to improve the communication skill of each student participating in the program.

### ART EDUCATION

There are teachers assigned to the elementary schools participating in this program who direct their teaching to first grade children and some second grade children on a regular scheduled basis. In addition, they are available to call on to work with other pupils and to assist all teachers in the schools they serve. These instructors are specialists in the field of Art, and through Art they teach the students to develop an awareness about himself and to express himself through or by means of Art, as well as developing the natural creative ability which resides in the children participating in the program. These services are not provided to the other schools similarly situated in this district and which do not participate in this program.

### PUPIL PERSONNEL SERVICES

Special services such as home visits, counselling, psychological evaluations, health and welfare services, etc., are included in this area. Guidance and testing services for the junior and senior high schools in Winston-Salem are organized under the Director and Coordinator of Guidance, who reports to the Director of Pupil Personnel Services. Guidance Counsellors work to help each student participating in this program to develop his potential to the fullest by providing him with opportunities to solve personal problems, by encouraging him to learn to accept himself and others, and by helping him use materials and information to learn about academic and vocational opportunities and educational requirements. Children in the Title I schools have a much greater concentration of these services than do children in the general school population similarly situated.

Concentrated social services are pro vided to these Title I schools by six nurses and eleven social workers who are available for the schools participating in this program on a full-time basis. Nurses and social workers work cooperatively to identify and correct health problems, treat and correct psychological behavior and other problems, and have Title I funds to use for these corrections. They are able to do personal and group counselling with students on health matters, behavior and academic problems to an extent not possible before or available in other schools in this school district and are able to effect special education placement for qualifying students, with proper interpretation to parents. The social workers in these schools have a greater responsibility for attendance and for eliminating any cause of non-attendance than was possible before Title I funds were available, and in the forty-nine schools not qualifying for Title I funds, there are only five social workers and each school is visited by a Public Health nurse once a week, and it is not possible because of the case load and distances to travel to provide the services to the students attending these schools as those given to the Title I schools.

## COMPREHENSIVE SCHOOL IMPROVEMENT PROJECT

This is a state supported program whose purpose is to upgrade the achievement of pupils, especially in reading and communication skills. It provides teacher aides, consultant services, and money for materials and equipment.

## TUTORIAL PROGRAM

Volunteers from throughout the community conduct extensive tutorial programs, largely in reading in the schools in the Title I areas. These volunteer tutors work directly under the supervision of the classroom teacher and give individual help to pupils who need special attention.

## FOOD SERVICES

There are two categories of special food service programs in which there will be interest.

1. *Special assistance for reduced cost lunches.*

With special reimbursement from federal funds, these schools serve a plate lunch, including a meat, two vegetables, milk, rolls, and butter for a maximum of twenty-five cents. Students pay twenty cents, fifteen cents, ten cents, five cents, or nothing, depending on their ability to pay. This reduced cost lunch is a more restricted menu than is provided in other schools where the plate lunch is thirty cents and where other items are sold a la carte for prices ranging from two cents to fifteen cents each.

2. *Breakfast.*

A special breakfast program is served in some schools for eligible children. If a child is participating in the special educational programs at his school and is economically deprived, he is eligible for the free breakfast.

The total amount of funds applied to participating schools and pupils in these programs administered under Title I is $863,419.00.

## MODEL CITY EDUCATIONAL PROGRAM

This project will affect all residents of the model city area, but it will have the most substantial impact on the students at North Elementary School, Lowrance School and Kimberley Park School. The plan called for these schools, and particularly North Elementary, is to be converted within the next year into a model school. Additional personnel and equipment will be provided, as well as substantial renovation and improvement of some of the facilities at these schools, and especially North Elementary School. The idea would be to make this school a model which could try out the most modern and up-to-date programs and educational activities which could be developed and which later hopefully could be expanded into other schools in the system which are not eligible to participate in this program. Students from the Lowrance, Kimberley Park, as well as all children who live in the model city neighborhood, will be able to participate in the program both during and after school hours.

The operational budget for the first year in these three schools is $696,704.00.

## CAREER OPPORTUNITY PROGRAM

This program provides for employment and on-the-job training for people from the low income areas of the community. These people will be employed in the school as teacher aides, library aides, guidance clerks, and in addition to being employed, they will receive both on-the-job and formal training which will enable them to upgrade themselves and possibly eventually become qualified and certified teachers. The benefit to the school system will be that the children in the participating schools will have the benefit of the services of these career opportunities people during the period in which they are being trained. The program calls for approximately twenty-five trainees to be in-

volved in this program in the schools which are participating.

Some of the schools participating in this program are:

Fairview
Brown
North Elementary

Carver Crest
Skyland
Hanes Junior

Lowrance

Kimberley Park

Anderson Junior
 and Senior
Atkins Senior

The total annual budget allotted to all participating schools and pupils in this program is $202,766.00.

## APPENDIX C
### New Faculty Ratios

| School | Tl Faculty | Exemptions | Adjusted Faculty | Tl Negro | % Negro | Tl White | % White |
|---|---|---|---|---|---|---|---|
| Ardmore | 25 | 1 | 24 | 7 | 29.17 | 17 | 70.83 |
| Bolton | 20 | | 20 | 6 | 30.00 | 14 | 70.00 |
| Brown | 26 | | 26 | 8 | 30.77 | 18 | 69.23 |
| Brunson | 28 | | 28 | 8 | 28.57 | 20 | 71.43 |
| Carver | 18 | 1 | 17 | 5 | 29.41 | 12 | 70.59 |
| Clemmons | 37 | | 37 | 11 | 29.73 | 26 | 70.27 |
| Cook | 20 | 2 | 18 | 5 | 27.78 | 13 | 72.22 |
| Diggs | 26 | 1 | 25 | 8 | 32.00 | 17 | 68.00 |
| Easton | 15 | 2 | 13 | 4 | 30.77 | 9 | 69.23 |
| Fairview | 26 | | 26 | 9 | 34.62 | 17 | 65.38 |
| Forest Park | 27 | | 27 | 8 | 29.63 | 19 | 70.37 |
| Fourteenth St. | 29 | 7 | 22 | 8 | 36.36 | 14 | 63.64 |
| Griffith | 39 | | 39 | 10 | 25.64 | 29 | 74.36 |
| Kernersville | 42 | | 42 | 12 | 28.57 | 30 | 71.43 |
| Kimberley Park | 32 | | 32 | 12 | 37.50 | 20 | 62.50 |
| Konnoak | 24 | 4 | 20 | 6 | 30.00 | 14 | 70.00 |
| Latham | 21 | 4 | 17 | 5 | 29.41 | 12 | 70.59 |
| Lowrance | 28 | 2 | 26 | 9 | 34.62 | 17 | 65.38 |
| Lewisville | 25 | 2 | 23 | 6 | 26.09 | 17 | 73.91 |
| Mebane | 21 | 2 | 19 | 7 | 36.84 | 12 | 63.16 |
| Mineral Springs | 33 | | 33 | 9 | 27.27 | 24 | 72.73 |
| Moore | 17 | 1 | 16 | 5 | 31.25 | 11 | 68.75 |
| North Elem. | 26 | | 26 | 10 | 38.46 | 16 | 61.54 |
| Oak Summit | 29 | 4 | 25 | 7 | 28.00 | 18 | 72.00 |
| Old Richmond | 14 | | 14 | 4 | 28.57 | 10 | 71.43 |
| Old Town | 48 | | 48 | 14 | 29.17 | 34 | 70.83 |
| Petree | 17 | 4 | 13 | 4 | 30.77 | 9 | 69.23 |
| Prince Ibraham | 14 | | 14 | 4 | 28.57 | 10 | 71.43 |
| Rural Hall | 37 | | 37 | 11 | 29.73 | 26 | 70.27 |
| Sedge Garden | 36 | | 36 | 10 | 27.78 | 26 | 72.22 |
| Sherwood Forest | 33 | | 33 | 9 | 27.27 | 24 | 72.73 |
| Skyland | 20 | | 20 | 6 | 30.00 | 14 | 70.00 |
| South Fork | 29 | | 29 | 8 | 27.59 | 21 | 72.41 |
| South Park | 21 | | 21 | 6 | 28.57 | 15 | 71.43 |
| Speas | 39 | | 39 | 12 | 30.77 | 27 | 69.23 |
| Union Cross | 25 | | 25 | 8 | 32.00 | 17 | 68.00 |
| Vienna | 17 | | 17 | 4 | 23.52 | 13 | 76.47 |
| Walkertown | 40 | 1 | 39 | 11 | 28.21 | 28 | 71.79 |
| Waughtown | 14 | 1 | 13 | 4 | 30.77 | 9 | 69.23 |
| Whitaker | 26 | 1 | 25 | 7 | 28.00 | 18 | 72.00 |
| Sub-total | 1064 | 40 | 1024 | 307 | 29.98 | 717 | 70.02 |
| *Children's Home | 12 | 0 | 12 | 2 | 16.67 | 10 | 83.33 |
| Grand-total | 1076 | 40 | 1036 | 309 | 29.83 | 727 | 70.17 |

* Children's Home includes grades 1 through 9

APPENDIX C (Cont'd.)
**New Faculty Ratios**

| Jr. High | Tl Faculty | Exemptions | Adjusted Faculty | Tl Negro | % Negro | Tl White | % White |
|---|---|---|---|---|---|---|---|
| Dalton | 36 | | 36 | 7 | 19.44 | 29 | 80.56 |
| Glenn | 32 | | 32 | 7 | 21.88 | 25 | 78.13 |
| Griffith | 24 | | 24 | 6 | 25.00 | 18 | 75.00 |
| Hanes | 27 | 2 | 25 | 7 | 28.00 | 18 | 72.00 |
| Hill | 28 | 2 | 26 | 5 | 19.23 | 21 | 80.77 |
| Jefferson | 34 | | 34 | 7 | 20.58 | 27 | 79.41 |
| Kennedy | 48 | 3 | 45 | 15 | 33.33 | 30 | 66.67 |
| Kernersville | 23 | | 23 | 5 | 21.74 | 18 | 78.26 |
| Mineral Springs | 38 | | 38 | 9 | 23.68 | 29 | 76.32 |
| Northwest | 45 | | 45 | 10 | 22.22 | 35 | 77.78 |
| Philo | 30 | 5 | 25 | 6 | 24.00 | 19 | 76.00 |
| Paisley | 28 | 2 | 26 | 8 | 30.77 | 18 | 69.23 |
| Southwest | 52 | | 52 | 11 | 21.15 | 41 | 78.85 |
| Walkertown | 30 | | 30 | 6 | 20.00 | 24 | 80.00 |
| Wiley | 37 | 1 | 36 | 7 | 19.44 | 29 | 80.56 |
| **Sr. High** | | | | | | | |
| Atkins | 52 | 4 | 48 | 15 | 31.25 | 33 | 68.75 |
| East | 69 | | 69 | 10 | 14.49 | 59 | 85.51 |
| North | 77 | | 77 | 13 | 16.88 | 64 | 83.12 |
| Reynolds | 80 | | 80 | 14 | 17.50 | 66 | 82.50 |
| Parkland | 64 | | 64 | 11 | 17.18 | 53 | 82.81 |
| West | 48 | | 48 | 8 | 16.67 | 40 | 83.33 |
| *Anderson | 45 | | 45 | 18 | 40.00 | 27 | 60.00 |
| *Carver | 25 | 1 | 24 | 11 | 45.83 | 13 | 54.17 |
| **Mt. Tabor | 50 | | 50 | 9 | 18.00 | 41 | 82.00 |
| Total | 1022 | 20 | 1002 | 225 | 22.46 | 777 | 77.54 |
| Grand Total | 2098 | 60 | 2038 | 534 | 26.20 | 1504 | 73.80 |

* Includes grades 7 through 12
** Includes grades 9 through 12

[A 2682]